# Richmond

OLLIE ADAMS, JR. v. COMMONWEALTH OF VIRGINIA.

November 30, 1959.

Record No. 4993.

Present, Eggleston, C. J., and Spratley, Buchanan, Whittle, Snead and I'Anson, JJ.

The opinion states the case.

*Jerrold G. Weinberg* and *Morris H. Fine (Fine, Fine, Legum, Weinberg & Schwan,* on brief), for the plaintiff in error.

*D. Gardiner Tyler, Assistant Attorney General (A. S. Harrison, Jr., Attorney General; Thomas M. Miller, Assistant Attorney General,* on brief), for the Commonwealth.

BUCHANAN, J., delivered the opinion of the court.

Ollie Adams, Jr., was indicted for the murder of Walker A. Jordan, was convicted by a jury of voluntary manslaughter and sentenced to five years in the penitentiary in accordance with the verdict. He was granted a writ of error. His assignments of error number 23 but in his brief they are resolved into four questions concerning the sufficiency of the evidence, the refusal of an instruction, the admission of certain testimony, and the argument of counsel.

The defendant admitted the slaying but claimed it was done in self-defense. The evidence as the jury could have evaluated it presented the following facts and circumstances of the killing:

Jordan was killed about 11 p.m. on June 16, 1958. Prior to that time he and his wife Barbara were having domestic troubles. She, called as a witness for the defendant, testified that she had been "going with" the defendant for about three months and that in May, before the killing in June, the defendant took her and a friend to look for an apartment and when they got back to the friend's house Jordan was there and he and the defendant had an argument, during which Jordan told the defendant that if he caught him with her again he would kill him. The friend testified to the same effect, adding that Jordan was angry but did not do anything, just argued. The defendant's version was that Jordan said if he caught him with his wife again he would kill both of them. She separated from her husband about four weeks before his death and had rented an apartment in her maiden name and without his knowledge on Claiborne avenue in the city of Norfolk.

She and the defendant were in that apartment on the night of June 16 about eleven o'clock when her husband came looking for her. The defendant said he was there to finish some painting in the apartment and was putting his brushes to soak, which was why he was there so

late. He testified that when Jordan arrived the door was only partially closed and Jordan walked in and said, "Is Barbara here?" He replied that she was not and Jordan told him he was lying, that she was there. The defendant repeated that she was not there, whereupon Jordan grabbed him by the collar of his shirt, saying, "This time I am going to kill you," and "cocked his knife up high"; that he then pulled the defendant through the door onto the front stoop, in spite of the defendant's struggles, and, said the defendant: "I reached in my pocket (demonstrating), and I grabbed my knife. I opened it and he swung at me (demonstrating). He swung at my neck (demonstrating). I kept my eye on his knife blade all the time. I saw the lick coming. I bowed low (demonstrating) enough for his fist to hit me on the right side of my neck, and I swung (demonstrating) low underarm by being left-handed and stabbed him in the chest. He said, 'You have cut me.' Then he released his hold and he began to run toward the gate. I dropped my knife and I ran down behind him. I caught him right at the gate."

He said that he then took off his own shirt, tried to stop the bleeding, then called to deceased's wife. He saw a lady going in the door and said to her, "Call the police, call an ambulance, I have hurt this man." He testified that he stabbed Jordan to keep Jordan from killing him.

Some significant differences appeared between his testimony and that of Barbara Jordan. She said that she and the defendant were getting ready to leave the apartment when her husband came up and knocked on the door; that she then went into the bathroom, from where she heard her husband ask the defendant if she was there, and heard his reply that she was not, to which her husband replied that she was there and that he was going to find her; that she then heard her husband say to the defendant that "this has been going on a long time. * * this was what he had been waiting for, and * * that he was going to kill him." But she further testified that when the defendant denied she was there her husband said, "Now, listen, all I want to do is talk to her, and I know she is here," and that after that she heard somebody walking around in the front room and in the kitchen and later she heard scuffling and heard a jar or vase or something fall, after which she heard the defendant calling to her from the outside. She told police officers that night that she was in the house next door at the time of the killing but later stated to them that she was in the bathroom; that the defendant and her husband went out into the yard,

she heard some loud talking, after which the defendant called her and said he had stabbed her husband. It was not until the afternoon of the following day that she stated she heard her husband threaten to kill the defendant.

Photographs showed blood spots in the yard near the door through which Jordan had entered and leading to where his body lay. The defendant's knife was found near the beginning of the blood spots but no knife was on Jordan's person nor in the yard, nor anywhere about the premises, although a diligent search was made by the police officers and others for more than two hours that night, beginning very soon after Jordan's death. Jordan's wife testified that the only knife she saw that night was the defendant's; that she saw none in her husband's hands or anywhere around him when she went to the place where the defendant was holding him up, and that she never knew him to carry a knife.

A man who lived a few doors away was called and on arrival found the defendant kneeling at the yard gate holding Jordan and there was blood on the ground. He asked the defendant what had happened and the defendant replied that the fellow had drawn a knife on him and that he had cut the fellow but hoped he wouldn't die.

The defendant told one of the police officers that night that he stabbed Jordan in "a tussle" over Jordan's wife, during which Jordan drew a knife on him and at that time he pulled his own knife and stabbed him during the tussle. He told another officer that night that Jordan had a knife in his hand when he came into the house, so he reached into his pocket and got his; that Jordan then pulled him outside onto the stoop, swung at him, and he, defendant, ducked and stabbed him. He told this officer there had been bad blood between him and Jordan for sometime over Jordan's wife, and that Jordan had called him a number of times and told him to leave his wife alone. He testified that he had had intercourse with Mrs. Jordan in his car but did not love her and she was not his girl friend.

Although defendant testified that he had just finished painting and was preparing to leave when Jordan came, there was evidence that the only light in the room was a kerosene lamp turned down so low that it gave practically no light, and some of Mrs. Jordan's underclothing was on a mattress on the floor of the room.

While the defendant testified that he stabbed Jordan to keep Jordan from killing him, yet the jury were not required to accept the defendant's statement as to how the killing occurred simply because the de-

fendant said it happened that way and no witnesses testified to the contrary. "If from the improbability of his story and his manner of relating it, or from its contradictions within itself, or by the attending facts and circumstances, the jury are convinced that he is not speaking the truth, they may reject his testimony, \* \*." *Randolph* v. *Commonwealth*, 190 Va. 256, 263, 56 S. E. 2d 226, 229.

"\* \* It is elementary law in this jurisdiction that every homicide is presumed to be murder in the second degree, and the burden of proving the elements necessary to elevate the crime to murder in the first degree is upon the Commonwealth. On the other hand, in order to reduce the offense from murder in the second degree to manslaughter or excusable homicide, the burden is upon the accused. \* \*." *Callahan* v. *Commonwealth*, 192 Va. 26, 31, 63 S. E. 2d 617, 620. *Adams* v. *Commonwealth*, 163 Va. 1053, 1059, 178 S. E. 29, 31; *Hale* v. *Commonwealth*, 165 Va. 808, 814, 183 S. E. 180, 182.

The evidence in this case was clearly sufficient to support the verdict of voluntary manslaughter. From it the jury could well conclude that Jordan was unarmed and that the defendant killed him not in self-defense but in mutual combat without malice. *M'Whirt's Case*, 44 Va. (3 Gratt.) 594, 605; 9 Mich. Jur., Homicide, § 31, p. 368.

█ Defendant next contends that the court erred in refusing his Instruction D-30. It would have told the jury that by committing adultery with Jordan's wife the defendant did not lose his right of justifiable self-defense as that term is defined and distinguished from excusable self-defense in *Dodson* v. *Commonwealth*, 159 Va. 976, 167 S. E. 260, and *Bailey* v. *Commonwealth*, 200 Va. 92, 104 S. E. 2d 28.

In the latter case it was pointed out that there is conflict of authority on the question of whether illicit relations between a slayer and the wife of the deceased deprive the slayer of the right to claim justifiable self-defense. It was not necessary to adopt either view in that case, nor is it necessary here. The defendant was not caught in the act of adultery with Jordan's wife and there is no evidence that Jordan knew the act had occurred. *Cf. Barnard* v. *Commonwealth*, 134 Va. 613, 623-4, 114 S. E. 563, 566.

On motion of the defendant the court gave Instruction D-26, which told the jury that if the defendant had committed adultery with Jordan's wife and if Jordan undertook to take the law in his own hands and do the defendant serious bodily harm, then the law of self-defense as defined in the instructions given was applicable to the defendant, and that if the jury had a reasonable doubt on the question of

self-defense as so defined they should find the defendant not guilty. In other instructions given at the request of the defendant the court sufficiently explained the law of justifiable and excusable homicide in self-defense, the doctrines of appearances, presumption of innocence, and reasonable doubt, 14 in all. The defendant was entitled to no more and there was no error in refusing his Instruction D-30.

█ Defendant further contends that error was committed in allowing the assistant Commonwealth's attorney "to bring out prior criminal acts of sexual immorality on the part of defendant and deceased's wife." Both of them testified as witnesses for the defendant in an effort to make a case of self-defense for him. The questions objected to were on cross-examination of these witnesses. They concerned the relations of these two persons to each other and the circumstances of their association. They were not about independent crimes unconnected with the offense for which defendant was being tried, as was the evidence in *Fleenor v. Commonwealth*, 200 Va. 270, 105 S. E. 2d 160. They related to the credibility of these witnesses and the weight which should be given their testimony, and they were admissible for that purpose. 20 Mich. Jur., Witnesses, § 72, p. 531.

█ Finally defendant complains that the assistant Commonwealth's attorney was allowed to make inflammatory argument to the jury. This point involves these occurrences:

The prosecutor was attacking what he claimed were contradictions in the defendant's testimony, in particular the defendant's statement that he was in the apartment at the request of Jordan's wife to do the painting and was charging her for his work, in spite of the alleged threats of Jordan that he would kill him the next time he caught him with Jordan's wife. The prosecutor was reaching his peroration on the wings of these words: "What woman—as reasonable men, what woman can you think of who attracted you so much so that if a person who had a legitimate interest in her had said to you, 'If I catch you messing around this woman—' "

He was interrupted by one of defendant's counsel who objected "to that line of argument * * as not proper, as examples in a case." The court overruled the objection and counsel noted an exception.

In his closing argument the prosecutor stated that the defendant did not have the burden of proof that the Commonwealth had but that he did have the burden of convincing the jury that his evidence had sufficient truth to cause the jury to have a reasonable doubt of the Commonwealth's case. Defendant's counsel objected, stating that the

defendant had no burden but stating in the next sentence "if our issue of self-defense raised reasonable doubt of the Commonwealth's case we are entitled to an acquittal * *." "We do have to raise a reasonable doubt." He then noted an exception—for what reason is not discernible—, the Commonwealth's attorney continued his argument, and defendant's counsel again objected. The court overruled the objection, whereupon the prosecutor gave vent to this expression: "I don't know what that is but it is a part of the same thing that has been going on for two days, an effort to mislead you and to fool you into turning some one loose who has no more business to be turned loose than a—" At that point defendant's counsel interrupted and said: "We submit * * that is improper argument and inflammatory." The court overruled the objection after making the observation that with this constant interruption in the middle of the statement it was impossible for the court to know what was objectionable and what was not. Defendant's counsel noted an exception.

Neither of these occurrences was helpful to the jury in performing its important duty. On the other hand it seems a reasonable conclusion that they could have done no harm to the defendant. They reflected little more than bad courtroom manners on the part of the prosecutor. As we have said, "Attorneys for the Commonwealth 'should always remember whose commission they bear and should scrupulously respect the rights of the accused.'" *Compton* v. *Commonwealth*, 190 Va. 48, 57, 55 S. E. 2d 446, 450. Neither of the statements was made the basis of a motion for a mistrial nor assigned as ground for setting aside the verdict. *Cf. Brann* v. *Woolworth Co.*, 181 Va. 213, 24 S. E. 2d 424; 2 Mich. Jur., Argument and Conduct of Counsel, § 22 at p. 84. While we disapprove of the assistant Commonwealth's attorney's remarks, yet they do not cast doubt upon the fairness of defendant's trial and were not of such moment as to require a reversal of this case.

We find no prejudicial error and the judgment below is

*Affirmed.*