# Richmond

Malcolm Leon Ward, Jr. v. Commonwealth of Virginia.

October 12, 1964.

Record No. 5821.

Present, Eggleston, C. J., and Spratley, Buchanan, Whittle, I'Anson and Carrico, JJ.

*T. Brooke Howard*, for the plaintiff in error.

*M. Harris Parker*, *Assistant Attorney General* (*Robert Y. Button*, *Attorney General*, on brief), for the Commonwealth.

WHITTLE, J., delivered the opinion of the court.

This case is before us upon a writ of error to a final judgment entered on the 9th day of July, 1963, wherein appellant, Malcolm Leon Ward, Jr., herein sometimes referred to as defendant or Ward, was found guilty of the first degree murder of Donald G. Cooley and sentenced to 40 years in the penitentiary.

The record discloses the following material proceedings in the trial court:

On the 3rd day of July, 1962, defendant was charged with murder. A warrant was obtained from a justice of the peace by detective Allen of the Alexandria police department, and on the same morning at 10:00 a.m. defendant, represented by counsel of his own choosing, was taken before the judge of the municipal court for a preliminary hearing. On motion of defense counsel the hearing was continued to the 11th day of July, 1962, at which time defendant was remanded to the grand jury and indicted for the murder of Cooley.

On the 17th day of June, 1963, defendant was arraigned and entered a plea of "not guilty". A motion was filed by defendant seeking to require the Commonwealth to make an election as to the charge upon which he was to be prosecuted, and at the same time a motion for a bill of particulars was filed. The court denied both motions, and exceptions were duly taken.

The record discloses that in April, 1962, defendant, then of the age of 19, and William Bodmer, known as Billy Bodmer, who was then 16 years of age, were friends living in the same vicinity. It appears that they had met at McArthur school in the neighborhood; they had known each other according to the defendant for only a few months, and according to Bodmer for about 5 years; prior to April Bodmer had entertained the thought of killing his stepfather, Donald G. Cooley, and had studied several ways to carry out his plans.

About a week before July 2, 1962, the date of the killing, Bodmer was "put on restriction" by his parents because he had set off a fire extinguisher at the school. He was ordered not to leave his house. During this time defendant called Bodmer on the telephone and asked him to "come out". Upon being told he was restrained by his parents from going out, defendant suggested that these were his stepparents and if he wanted to leave the house it was all right for him to do so since they were not his real parents. (Mrs. Cooley was Bodmer's mother and Cooley was his stepfather) Bodmer testified that defendant then asked him why he did not kill them.

A week later Bodmer and defendant discussed plans as to how to carry out the suggested killing. Several gruesome plans were discussed between the two and finally, according to Bodmer, a plan was settled upon wherein Bodmer was to stab his stepfather with an ice pick and defendant was to shoot Mrs. Cooley. They were to put the bodies in the trunk of a car, and were to take them 50 miles from the scene and place them in the woods, after which they were to return to their respective homes. According to Bodmer, Ward said he knew some friends who would pose as Bodmer's parents and would telephone the Alexandria passenger station to buy train tickets for a supposed extended trip. In that way, if anyone asked Bodmer where his parents were he could tell them they were on a trip.

Bodmer further testified that on the day before the murder, at about 2:00 p.m. he was at defendant's home and in a discussion about using the ice pick as the murder weapon defendant told Bodmer where to stab the victim in order to kill him instantly.

Suffice it to say that this plan was adopted, although as will be seen it was not consummated in every particular. Defendant admitted securing a .22 rifle and later borrowing 7 or 8 bullets from a neighbor, which he said were to be used on a hunt. On the evening of the murder both defendant and Bodmer went to the Cooley home. Mr. Cooley was asleep in a chair and Mrs. Cooley was engaged in household duties. When Mrs. Cooley left the house and

went into the yard for some purpose, defendant suggested that Bodmer kill his stepfather now "while your mother is not in here". Whereupon, Bodmer plunged the ice pick into his stepfather's chest, continuing to stab him again and again. Cooley arose from the chair and struggled towards the kitchen in the direction of the defendant who was standing with the loaded rifle in the doorway of that room. At this moment defendant raised the gun and shot Cooley in the stomach.

When Mrs. Cooley returned, Bodmer pushed her and her wounded husband into the bedroom where he stabbed his mother several times. After the murder of Cooley and the wounding of his wife, Bodmer and Ward left, driving away in the Cooley family car. They parted company in Alexandria, Ward returning to his home and Bodmer going to Baltimore where he was later apprehended.

Defendant Ward reached his home at 9:05 p.m. and found police officer Shockley there, whereupon the officer asked him where he had been. Defendant replied that he had witnessed a terrible thing, that it was horrible and that he wanted to talk to him and tell him all about it. Prior to Ward's making a statement to the officer, Ward's father said to him, "You don't have to say anything unless you see an attorney. Just give him your name and address and such." But defendant replied, "No, I want to tell you." Whereupon, defendant told the officer that while at the Cooley residence he had seen Billy Bodmer stab his father; that Billy had called his mother into the house and said something was wrong with his father; that after he had seen the stabbing (of Cooley) Cooley got up from the chair and came towards him (the defendant) and he had a gun in his possession at that time, and when Mr. Cooley came towards him, his (Cooley's) hands were in the air. At that time the defendant "went away from Mr. Cooley" and as he "went", the gun accidentally went off.

Later the officers secured two statements from defendant. Before taking each statement detective Allen interrupted defendant and "told him that anything he said could be used against him if he was involved in it and that he also had a right to consult an attorney." Whereupon defendant said he understood that and voluntarily gave the two statements referred to.

At the trial of defendant his counsel entered into a stipulation that the rifle filed as an exhibit was the gun used by defendant, that it was in the possession of defendant at the time it was fired, and that the bullet that was fired from it struck Donald Cooley. It was also

stipulated that the bullet filed as an exhibit was the bullet fired from the gun and was the one removed from the body of Donald Cooley; that the autopsy report and medical examiner's report were stipulated as a Commonwealth exhibit, the autopsy showing the cause of death to be due to the blood in the thoracic cavities, the pleural cavities, and also in the abdominal cavity, resulting from the stab wounds and gunshot wounds, respectively.

Defendant presents five questions on this appeal in which he contends the trial court erred. These will be taken up in the order presented.

"1. Did the court err when it denied the motion of the defendant, asking that the Commonwealth Attorney be required to elect whether he was going to try the defendant on a charge of being the actual perpetrator of the crime, or as an aider and abettor in the second degree of first degree murder?"

Code § 19.1-166 contains the form which is deemed sufficient as an indictment for murder. That form was used in this case. An indictment for murder in the first degree under this Code section need not charge specifically the facts showing the offense. The form of an indictment for murder employed in this case is sufficient to charge murder in the first and second degree or any lower grade of homicide. It is not necessary that the indictment should charge murder in the first degree or use that description which, according to the statute, constitutes that degree of offense. 9 M.J., Homicide, § 51, at page 387.

Under Code § 18.1-11 principals in the second degree may be indicted, tried, convicted and punished in all respects as if a principal in the first degree. A principal in the second degree is one not the perpetrator of the crime, who is present, aiding and abetting the act done, or keeping watch or guard at some convenient distance. *Snyder v. Commonwealth*, 202 Va. 1009, 1015, 121 S.E. 2d 452, 457. Since in the instant case the indictment contained but one single count and charged only one homicide, the Commonwealth was not required to elect whether it would prosecute the defendant on a charge of aiding and abetting or being a principal in the first degree. There is no merit in this assignment.

The second question reads:

"2. Did the court err when it failed to require the Commonwealth to give the defendant a brief statement of the circumstances on which it intended to rely to prove the guilt of the defendant?"

To shorten this question, was the Commonwealth required to give defendant a bill of particulars?

The decision as to whether or not a bill of particulars should be given in a criminal case is within the sound discretion of the trial court. *Jennings* v. *Commonwealth*, 133 Va. 726, 112 S. E. 602; *Snead* v. *Smyth*, 273 F. 2d 838, 841 (4th Cir. 1959).

The case of *Livingston* v. *Commonwealth*, 184 Va. 830, 837, 36 S.E. 2d 561, 565, states the function of a bill of particulars. There it is said:

"It is true that a bill of particulars is not for the purpose of charging the offense. The indictment must do that. The accused cannot be tried on a bill of particulars alone. However, the bill of particulars and the indictment must be read together. The function of the bill of particulars is to supply additional information concerning the accusation. The decisive consideration in each case is whether the matter claimed to be left out of the indictment has resulted in depriving the accused of a substantial right and subjects him to danger of being tried upon a charge for which he has not been indicted."

For a rather full discussion as to whether courts erred in not requiring the Commonwealth to file a bill of particulars, because the indictment was in the common law for murder and did not expressly charge murder in the first degree, reference in here made to *Jarrell* v. *Commonwealth* (1922), 132 Va. 551, 559-60, 110 S.E. 430, 432-33, and cases there cited. See also the recent case (1961) of *Tasker* v. *Commonwealth*, 202 Va. 1019, 1023, 121 S.E. 2d 459, 462.

The indictment against defendant in the instant case charged that he did feloniously with malice aforethought maliciously kill and murder one Donald G. Cooley. The jury found him guilty as charged in the indictment. Thus, the charge against defendant as a principal in the first degree was completely set forth in the indictment and he was found guilty of that charge and none other. There was no matter claimed to be left out and defendant was not deprived of a substantial right and could not be subject to the danger of being tried upon a charge for which he had not been indicted. It is conceded that the indictment was in proper form, thus defendant was not entitled to any more specific information concerning the crime with which he was charged. There is no affirmative showing that defendant was prejudiced by the failure of the court to require a bill of particulars. See 3 M.J., Bill of Particulars, § 8, page 176.

The next question posed reads as follows:

"3. Did the court err when it failed to sustain the motion of the

defendant made at the conclusion of the Commonwealth's evidence wherein the defendant asked that he be found not guilty on a charge of first degree murder because there was no evidence produced by the Commonwealth beyond a reasonable doubt to establish this degree of homicide?"

In other words, was the evidence sufficient to sustain the conviction?

Here the gist of defendant's argument is that there was no showing of motive or intent on his part to kill the decedent. It is elementary that it is not necessary to show motive as the reason for the killing in order to convict of first degree murder. Motive is not an essential element of the crime of murder. *Thomas* v. *Commonwealth*, 186 Va. 131, 139, 41 S.E. 2d 476, 479; *Pointer* v. *United States*, 151 U.S. 396, 417, 14 S.Ct. 410, 38 L. ed. 208. Motive is usually an element relevant to establish intent when a conviction is based primarily on circumstantial evidence. Defendant's conviction does not rest on such evidence. The evidence is that this defendant intentionally entered into a plan to kill the parents of Billy Bodmer, and his motive, if it can be called one, was to aid his friend Bodmer in doing away with his parents.

The evidence clearly shows that in executing the plan which defendant had made, he acquired the .22 caliber bullets; he loaded the rifle with one of these; he had the gun in his possession when Donald Cooley was shot. The evidence further shows that the bullets fired from this gun contributed to the death of Cooley and that the defendant had an intent to aid his friend Bodmer not only by being present during the killing, but also by actively participating therein.

In this case it was not required of the Commonwealth to show a motive or reason for the killing. *Oliver* v. *Commonwealth*, 151 Va. 533, 145 S.E. 307. Under the circumstances here it is presumed to have been prompted by malice, *Bradshaw* v. *Commonwealth*, 174 Va. 391, 4 S.E. 2d 752; and that it was wilful, deliberate and premeditated. *Karnes* v. *Commonwealth*, 125 Va. 758, 99 S.E. 562, 4 A.L.R. 1509.

It is true that there was conflicting testimony about the gun going off accidentally. Defendant says that as the deceased approached him and when he was attempting to get away the gun accidentally fired; whereas Bodmer testified that defendant deliberately fired the gun at the decedent. There is also ample evidence upon which to conclude that defendant had assisted in the formulation of the plan to kill the Cooleys and had actively assisted in the carrying out of

the plan. The jury in this instance chose to believe Bodmer's testimony that defendant deliberately fired the gun at the decedent. The jury was not required to accept defendant's statement as to how the killing occurred simply because defendant said that it happened in the way related by him. *Adams* v. *Commonwealth*, 201 Va. 321, 324-25, 111 S.E. 2d 396, 398-99. The evidence was amply sufficient to sustain the verdict.

The fourth question posed by defendant reads:

"4. Did the trial court err when it denied the motion of the defendant that the written statements given by the defendant be suppressed on the ground that methods used by the police officers in obtaining the same were in violation of the defendant's rights under Section 1 of the 14th Amendment of the Constitution of the United States of America, the 5th Amendment of the Constitution of the United States of America, and Section 8, Article I of the Constitution of Virginia?"

In other words, were the statements voluntarily made by defendant? We hold that they were and thus properly admitted by the court. In the first place, defendant took the stand in his own behalf and, as we understand the facts as developed by his counsel, there is little difference, if any, between the written statements given by defendant and the facts testified to by him on the trial.

It will be remembered that prior to Ward's making any statement to the officer his father said to him, "You don't have to say anything unless you see an attorney. Just give your name and address and such". Whereupon, defendant said, "No, I want to tell you", and without any urging on the part of the officer proceeded voluntarily to tell what had transpired. This information was later reduced to writing and voluntarily signed by defendant after having been advised that he did not have to make a statement and that if he did such could be used against him in a court of law. He was also advised that he had a right to consult an attorney before making a statement and certainly no threats, promises or offers of reward were made to him in securing the statements. In fact, counsel for defendant stated, "I do not for one minute question that officers Allen and Canard did not * * * tell him what his rights were * * * ".

It is true that the burden of proving that an extrajudicial confession is voluntarily made before it can be admitted into evidence is upon the Commonwealth. It is also true that this burden was carried to the satisfaction of the trial judge and we hold that he rightly ruled that the statements were admissible. It is conceded in defendant's brief

that the statements were obtained without any show of force or by any threats or promises.

Defendant argues that it is "the totality of the circumstances" which is the standard to be applied to determine whether a statement is voluntary or not. It is not necessary for us to pass upon the "totality" theory advanced by defendant for here it is apparent that the statements complained of were made voluntarily. In fact, it appears that the defendant insisted upon telling all. Certainly there is no rule of law which requires an arresting officer to close his ears to voluntary statements made by a person in his presence. *James* v. *Commonwealth* (1951), 192 Va. 713, 718, 66 S.E. 2d 513, 516. There is nothing in the case before us which tends to indicate that the statements made by defendant were involuntary, on the contrary, everything points to the fact that they were not.

The cases cited by defendant in his brief are easily distinguishable from the case at bar. The latest case cited, *Escobedo* v. *State of Illinois*, 378 U.S. 478, 84 S.Ct. 1758, 12 L. ed. 2d 977, decided 1964, is illustrative. In that case defendant was refused the right to talk with his counsel after counsel had arrived at the place where defendant was being detained, and at no time was Escobedo advised of his constitutional rights. Such are not the facts in the case at bar. Even under the strict rules laid down by the Supreme Court the statements in this instance would, in our opinion, be admissible. There is no merit in this assignment.

■ The final and crucial question in this case is did the court err in denying defendant's motion for a mistrial.

Defendant on two occasions moved the court for a mistrial. The first was brought about when the Commonwealth placed Billy Bodmer on the stand and the following transpired: The attorney for the Commonwealth proceeded to examine Bodmer and asked the following questions:

"Q. Billy, will you state your full name, please?

"A. Billy Bodmer.

"Q. Billy, you have recently been convicted of murder in the first degree and sentenced to the penitentiary for 48 years?"

Whereupon counsel for defendant immediately moved for a mistrial on the basis that placing such information before the jury constituted "flagrant prejudice to the rights of the accused, and in effect, asked the jury to use the Bodmer sentence as a yardstick if they should find the defendant guilty".

The trial court stated that this question, or statement, by the

Commonwealth's attorney "could very easily be" prejudicial to the rights of defendant. However, notwithstanding this feeling on the part of the court, the motion for a mistrial was denied. The court stated to the attorney for defendant, "If you object to the question, I will say it is immaterial, the question is immaterial and irrelevant". Whereupon, the attorney for defendant said "* * * I did not know what he was going to ask before he did". The court: "I say, if you do not object to the question, he can answer it. If you object to the question, I will sustain the objection." Whereupon the attorney for defendant suggested that the statement made by the Commonwealth's attorney was not a question at all, "but a positive statement of fact. Naturally, under the circumstances, it would matter little to the jury whether the witness then obediently agreed with the Commonwealth attorney's statement or not. The irreparable damage had been done."

After much argument Bodmer was permitted to answer the question in the affirmative. Later, in the closing argument before the jury, the Commonwealth's attorney made the following statement:

"Billy Bodmer has been convicted of murder in the first degree and has been sentenced to the penitentiary, are you going to let Billy bear the whole burden?"

Here, counsel for defendant again moved for a mistrial and again the motion was denied. However, the court did instruct the jury to disregard the statement.

We hold that both the question and the statement by the Commonwealth's attorney were prejudicial to the accused and a mistrial should have been ordered.

Apparently the authorities are in agreement that the introduction into evidence of a guilty plea and sentencing of a co-defendant or an accomplice constitutes error. See *State* v. *Turner*, (Mo.), 272 S.W. 2d 266, 48 A.L.R. 2d 1008. The question as to whether the error is sufficiently prejudicial to the rights of the defendant to require a reversal of the case for a new trial, according to the authorities, depends upon two chief considerations: first, whether timely objection was interposed at trial, and second, whether the court cured the error by immediately instructing the jury to disregard the evidence as being improper. See annotations in 48 A.L.R. 2d 1021; *McLean* v. *Commonwealth*, 186 Va. 398, 43 S.E. 2d 45.

In the instant case we have a situation where improper and irrelevant information was transmitted to the jury by the Commonwealth's attorney on two separate occasions, once during the course

of the trial and again in his closing argument. The subject matter was the same on both occasions and motions for mistrial were promptly made and overruled. On the first occasion the court did not instruct the jury on the impropriety of the information; on the second occasion the jury was so instructed. In this instance, the first error was compounded by the second and it would be hard to blot the information from the minds of a jury. We feel that what was said in *Smith* v. *State*, 133 Texas Crim. 382, 111 S.W. 2d 275 is appropriate here:

"However, we can scarcely conceive of a more hurtful question than to ask if the witness, who was engaged in commission of the same offense for which the appellant was charged, had not already been convicted for such offense and was serving a term in the penitentiary therefor. The appellant's attorneys were forced to object thereto and such objection could only lead the jury to conclude that such facts were true, and the necessary implications had to follow. We think the Court's prompt instruction could not possibly eliminate these conclusions and implications from the jury's mind."

We have no way of knowing the effect that this concededly improper information had upon the minds of the jury. It would be impossible for us to say that the error was not prejudicial. The law presumes that it was.

For the foregoing reason the judgment of the trial court is reversed, the verdict of the jury set aside and the case remanded for a new trial.

*Reversed and remanded.*