## Richmond

WILLIAM LEON BARBER, SR. v. COMMONWEALTH OF VIRGINIA.

June 14, 1965.

Record No. 5998.

Present, All the Justices.

*Donald Grant Wise (Horace L. Wise; Wise, Wise & Wise,* on brief), for the plaintiff in error.

*M. Harris Parker, Assistant Attorney General (Robert Y. Button, Attorney General,* on brief), for the Commonwealth.

CARRICO, J., delivered the opinion of the court.

William Leon Barber, Sr., the defendant, was indicted by the grand jury for the murder of his wife, Sadie P. Barber. A plea of not guilty was entered and a trial by jury was held. The defendant was convicted of murder in the first degree and his punishment was fixed at confinement in the penitentiary for life. The trial court approved the verdict and sentenced the defendant to the penalty fixed by the jury. The defendant was granted a writ of error.

On November 21, 1960, the police department of Norfolk County received a telephone message that Sadie Barber was missing. On the following day, the defendant appeared at police headquarters and filled out a "missing persons" report.

On December 5, 1960, W. A. Caudle, a deputy sheriff of Dinwiddie County, received information that a body had been discovered in his county. He drove to the location and found the body covered by brush and leaves, lying in a wooded area near a dirt road one hundred feet from the public highway. The body was that of a woman, dressed in a nightgown. The deceased woman was lying on her back with her hands tied. The county medical examiner was called and the body was removed to the state medical laboratory in Richmond.

The description of the woman's body fitted that of Sadie Barber. The police attempted to contact the defendant, without success. Later, the defendant telephoned police headquarters to inquire about the "missing persons" report and was then advised of the discovery of the body in Dinwiddie County.

Accompanied by his son-in-law and several police officers, the defendant went to the medical laboratory in Richmond. When he was taken to view the body, he gave it a cursory glance from a distance of several feet and said "that's Sadie all right." He stated that he "didn't know why anybody would kill Sadie."

According to the testimony of the Chief Medical Examiner of the Commonwealth, the body was in a state of "considerable decomposition . . . not in any wise due to weather conditions." Two .22 caliber bullets were found in the back of the head, one of which had penetrated and "almost completely destroyed" the left cerebellum. The other bullet had lodged near the vertex of the head but had not penetrated the skull. There was a laceration above the left ear three and one-half inches in length and a laceration on the back of the head two and one-half inches long. In addition, there were other lacerations about the head.

In the opinion of the Chief Medical Examiner, the bullet wound in the left cerebellum was the cause of death. The Examiner was unable to find any powder burns about the body and he expressed the opinion that the muzzle of the death weapon "had to be in excess of three feet from the head of Sadie Barber when the shots were fired."

The defendant was questioned by J. Arthur Hodges, Sheriff of Norfolk County, and members of the Norfolk County Police Department. An examination of the defendant's automobile revealed a substance in the trunk "appearing to be blood." The defendant agreed to leave the vehicle with the police so that an analysis could be made of the substance.

The car was parked in front of police headquarters with its doors locked, the police taking possession of the keys. The next morning, on December 7, it was discovered that the automobile had been removed from its location in front of the police department. The defendant could not be found. An alarm was broadcast and the next day a state trooper apprehended the defendant driving the vehicle which had been removed from police headquarters.

An examination of the defendant's home revealed a substance on a television set, a wall and a picture which, upon analysis, proved to be human blood.

The defendant was again questioned by Sheriff Hodges and the police on December 8. He requested an opportunity to talk with his attorneys and, in response to his telephone call, two attorneys appeared at police headquarters and discussed the case with him for approximately an hour.

The defendant then notified Sheriff Hodges that he was prepared to make a statement. He informed the sheriff that he had told his attorneys the truth and said, "I killed her." The sheriff advised the defendant of his right to counsel and warned him that "if he said anything it could be used for or against him."

The defendant's statement, as shown by the testimony of Sheriff Hodges, was as follows:

"Mr. Barber stated that he and Sadie Barber were at their home on the morning of November 21, 1960. Mrs. Barber came at Mr. Barber with a kitchen knife which he took from her and hid. She then procured an iron bar and attacked him and he wrestled the instrument from her hands. She then obtained a gun from the bedroom and pointed the gun at him and pulled the trigger but the gun failed

to fire. He said he took the gun from her and laid it down on a table. She then said, 'You son-of-a-bitch, I'm going to kill you'; grabbed the gun and the defendant and Mrs. Barber began to wrestle. It was while they were wrestling that the gun discharged. Mrs. Barber then stated that she was going to call the police. Mr. Barber said that the two bullets 'didn't faze her.' She walked over to the telephone and said she was going to call the police and he pulled the iron bar from his hip pocket and struck her on the head several times. This bar was the same one he had taken from her earlier. He said she fell on the couch and rolled off on the floor; that he attempted to help her while she told him how much she loved him. He obtained water for her and after drinking the water she died. Mr. Barber further stated to Sheriff Hodges and the officers that he took Sadie Barber's body into the junk room of their residence and wrapped her head in plastic bags to keep the blood off the floor. Mr. Barber then said that he took some string and tied her arms so they wouldn't flop around. Mr. Barber said that he took Mrs. Barber by the legs like you would 'pull a damned hog' and pulled her to the utility room. Mr. Barber said he left Sadie's body in this room until about 3:30 a. m. of November 22 when he placed it in the trunk of his car and parked the car in front of their house. The same morning he went to the Naval Hospital for treatment during which time he left Sadie's body in the car trunk. After treatment at the Portsmouth Naval Hospital, he visited a friend in Norfolk and, about 5 p. m. on November 23, he drove his car to Dinwiddie County where he drove up a dirt road, removed the body, put some leaves on ·it and returned to his home in Norfolk County. He stated he had taken the body to Dinwiddie County so no one would think he had killed her."

A warrant of arrest was then secured for the defendant, charging him with the murder of his wife. On December 16, 1960, the Circuit Court of Norfolk County committed the defendant to Southwestern State Hospital at Marion for "determination of his mental condition."

On December 30, the defendant's attorneys notified the court that they were withdrawing from the case and requested that the court appoint counsel for the defendant. Accordingly, Gordon F. Marsh and Donald H. Sandie were appointed counsel for the defendant and they represented him until the termination of the proceedings in the trial court.

On January 3, 1961, the grand jury returned its indictment against the defendant, charging him with the murder of Sadie P. Barber.

On May 29, 1961, Southwestern State Hospital reported to the court on the defendant's condition and on June 16, 1961, an order was entered directing the defendant's return to Norfolk County for trial. The trial took place on August 3, 1961.

Following the defendant's conviction, Mr. Marsh and Mr. Sandie withdrew from further participation in the case and Horace L. Wise was appointed as the defendant's counsel. He has ably represented the defendant on this appeal.

The defendant has made six assignments of error to the actions of the trial court. They will be discussed in the order assigned.

■ The defendant first contends that the trial court erred in trying him on the indictment returned by the grand jury. He says that the indictment "was fundamentally defective in that it failed to state that the defendant murdered the deceased 'with malice afore-thought', or that any malice was involved whatsoever."

The indictment charged that the defendant "on the 21 day of November, in the year 1960, in the said County of Norfolk, feloniously did kill and murder one said Sadie P. Barber, against the peace and dignity of the Commonwealth."

The defendant relies upon the decision in the case of *The Commonwealth* v. *Levi Gibson*, 2 Va. Cas. (4 Va.) 70, 74, where it was said:

"The Court is further of opinion, that in Indictments for murder, it is necessary to aver that the person indicted, 'of his malice afore-thought' killed and murdered the deceased."

But the *Gibson* case was decided in 1817, long before the legislature, in 1930, enacted Code, § 19.1-166 in its present form. That Code section provides for a short form of indictment in murder cases. The indictment before us precisely follows the statutory short form.

The form of indictment provided for in Code, § 19.1-166 "is deemed sufficient as an indictment for murder," *Ward* v. *Commonwealth*, 205 Va. 564, 568, 138 S. E. 2d 293, and "this court has consistently held that an indictment charging murder is sufficient to sustain a conviction of murder in the first degree." *Hurd* v. *Commonwealth*, 159 Va. 880, 884, 165 S. E. 536.

Contentions similar to that made by the defendant are so often asserted against the form of indictment involved in this case, that

it would not be amiss to repeat what was said in *Hobson* v. *Youell,* 177 Va. 906, 912, 15 S. E. 2d 76:

" 'If, therefore, any proposition of law can be considered as settled by decision and no longer open to debate' . . . then the proposition that the short statutory form of indictment for murder includes the charge of murder in the first degree is now the established law in this Commonwealth . . . ."

We hold, therefore, that the defendant's first contention is without merit.

■ The defendant next contends that the court erred in refusing to grant a continuance of the trial of his case.

On July 20, 1961, two weeks before the case was scheduled to be tried on August 3, the defendant's attorneys appeared before the court and moved for a continuance, which the court refused.

Six reasons were assigned by the defendant's attorneys as grounds for the granting of a continuance. Each will be set forth and then discussed.

1. Counsel had been unable to see the defendant until he was returned from Southwestern State Hospital, had not had an opportunity to prepare for trial and, consequently, were not prepared to go to trial.

The record discloses that the defendant was returned to Norfolk County from Southwestern State Hospital on July 4, 1961, one month in advance of the trial date. No assertion is made that defense counsel did not fully discuss the case with the defendant between the date of his return and the date the motion for continuance was made. Nor is there any showing that the one-month period prior to the trial date was not completely sufficient for such discussion.

The trial court made its appointment of counsel for the defendant in January of 1961, immediately after his self-employed attorneys withdrew from the case and seven months before the trial took place. There is nothing in the record to indicate that the court-appointed attorneys were not fully prepared when the case was tried, or that in the trial they left undone anything which effective representation of their client demanded of them.

2. Counsel had not received a pathological or autopsy report from the Commonwealth.

The report thus referred to was available to the defendant at any time after the examination of the body of Sadie Barber by the Chief Medical Examiner in December of 1960, upon a request to the

office of the Examiner. There is nothing in the record to indicate that any information with respect to the examination was ever withheld from the defendant. Nor does the record suggest that the defendant did not have the report when his case went to trial on August 3.

3. Counsel had been unable to employ a psychiatrist to examine the defendant.

Although this assertion was made on July 20, 1961, when the motion for continuance was argued, the record discloses that, before the actual trial date, the defendant was examined by two psychiatrists, employed by him, both of whom testified at the trial.

4. Counsel had not received a psychiatric report from the Commonwealth.

Code, §§ 19.1-227 to 19.1-239 set forth the procedure for the commitment to a state hospital for observation of a person charged with crime when there is reason to believe that his mental condition makes such confinement necessary.

Code, § 19.1-230 provides for notification by the superintendent of the hospital to the committing court when such person has been found to be not insane. The section requires nothing more than a report that the person is not insane. Such a report was made to the court in this case, as disclosed by an order entered on June 16, 1961, and was available to the defendant and his attorneys at all times thereafter.

5. Counsel did not have the names of the physicians at Southwestern State Hospital who had examined the defendant.

The names of these physicians were readily available to the defendant upon his request. If he had not secured them when his motion for continuance was made, he still had ample time before his trial date to secure them. There is no showing that he did not, in fact, have the names in advance of his trial or that he was taken by surprise when two of the doctors from Southwestern State Hospital testified as witnesses for the Commonwealth.

Moreover, as to grounds 3, 4 and 5 of the motion for continuance, it should be noted that the defendant, at his trial, did not rely upon the defense of insanity and neither of his own psychiatrists supported such defense. To the contrary, one of these doctors stated that the defendant "was legally and medically sane."

6. Counsel had not received a copy of a bill of particulars from the Commonwealth's Attorney.

The record shows that the original of the bill of particulars was filed in the clerk's office on July 19, 1961, the day before the motion for continuance was made. The certificate at the end of the bill of particulars shows that a copy of the bill was mailed to defense counsel on the same date that the original was filed. The defendant concedes that the copy was received by his attorneys on July 21. An examination of the bill of particulars discloses that it contained little, if any, information which the defendant and his attorneys did not already know.

In such a situation, the granting or denying of the motion for continuance rested in the sound discretion of the trial court. It is extremely difficult, when the grounds of the motion and the attendant circumstances are analyzed, to perceive how the defendant was prejudiced by the denial or to escape the conclusion that the motion was employed as a delaying tactic. We cannot say, therefore, that the trial court abused its discretion in this instance.

■ We now turn to the contention upon which the defendant places great emphasis. That contention relates to testimony given by Sheriff Hodges concerning a lie detector test.

It will be recalled that when the defendant was questioned, he requested and was granted permission to discuss the case with his attorneys. He then notified the sheriff that he was prepared to make a statement.

The sheriff testified that "after Mr. Barber's attorneys left, he was asked if he would agree to take a lie detector test. Mr. Barber stated that that was not necessary and that he had told his lawyers the truth." The defendant strenuously argues that "it was prejudicial error for the court to allow the testimony of Sheriff J. A. Hodges to the effect that he asked the defendant to take a lie detector test and that the defendant refused."

We have not previously dealt with the precise question here presented. Our only previous rulings relating to tests of such nature are found in *Lee v. Commonwealth*, 200 Va. 233, 237, 105 S. E. 2d 152, and *Orange v. Commonwealth*, 191 Va. 423, 439, 61 S. E. 2d 267.

In the *Lee* case, the defendant unsuccessfully sought to introduce into evidence the findings, favorable to him, of a lie detector test conducted through the use of a Keeley Polygraph. We upheld the rejection of such evidence, stating that "such tests generally have not as yet been proved scientifically reliable, and therefore the exclusion of the evidence was not error."

In the *Orange* case, we upheld the exclusion of evidence which the defendant attempted to introduce relating to the results of certain "truth serum" tests. Noting that there was no "evidence with respect to the value or the reliability of the tests," the court ruled that "clearly the result of this test did not constitute admissible evidence."

In 95 A.L.R. 2d at page 820 there is a recent and comprehensive annotation dealing with the subject of lie detector tests and numerous cases are there collected from sixteen jurisdictions in which the question has been presented. The summary made by the author of that annotation is:

"It has generally been held improper to admit evidence that an accused had been willing or unwilling to take a lie detector test; comments making such disclosure have also been held improper at a trial. . . .

"Although such a disclosure is improper, it does not follow that it is always prejudicial to a defendant. In order to determine whether reversible error arises from such evidence or comment, consideration must be given (1) to the nature of the error, particularly as it may abridge some constitutionally guaranteed right, or work a denial of a fair trial by improper influence upon the fact-finder; (2) to the circumstances attending the disclosure or offer of disclosure, such as by which party it was first made, or whether the evidence of the accused's guilt was generally weak or strong, or whether action taken by the court may have effectively cured the error.

"Whether evidence or comment as to the refusal or willingness to take the lie detector test results in prejudicial error so as to require a reversal of a conviction depends on the appellate court's assessment of a large variety of factors, which must be weighed in the context of the particular case. Reversal has resulted in a substantial number of cases, although there are also many cases holding that under the circumstances no prejudicial or reversible error resulted."

Applying these rules to the case before us, we find that the testimony of Sheriff Hodges did not show, as the defendant contends, a refusal by the defendant to submit to the lie detector test. The reply to the sheriff's request was that such a test "was not necessary—I have told my lawyers the truth." That reply could not have prejudiced the defendant in the eyes of the jurors. It could not have created in their minds a belief that he was unwilling to submit

to something which, if he were innocent, would have substantiated his innocence or, on the other hand, if he were guilty, would have shown that fact. To the contrary, the defendant's reply was a strong assertion of his truthfulness which, in his mind, would have been unaffected by any such test. The evidence in question was, therefore, not prejudicial to the defendant.

By the same token, the disputed evidence did not abridge any constitutionally guaranteed right of the defendant. The only right of such a nature which need be considered is that protecting against self-incrimination. Since the defendant's reply to the sheriff was not incriminating and was not prejudicial, it cannot be said that any such right was invaded.

From the record, it is not clear in what manner the questioned evidence happened to appear in the case, that is, whether it was brought out as a result of a question by the Commonwealth's Attorney or whether the witness, Sheriff Hodges, merely volunteered the information. It is clear, however, that no point relating thereto nor any comment thereon was made at any time in the trial, either by the Commonwealth's Attorney, by defense counsel or by the trial court. It was not used by the Commonwealth's Attorney in his opening statement or in his closing argument to the jury. In short, it is apparent that the evidence under discussion received but little notice during the course of the trial.

Finally, the evidence of the defendant's guilt was, as will later be shown, strong and conclusive. It is inconceivable that the jury, confronted with such strong evidence, would have returned any different verdict if the testimony concerning the lie detector test had been omitted from the case.

Under these circumstances, while we agree that the admission of the disputed evidence was error, we hold that such did not constitute reversible error. In so deciding, we do not retreat from the belief, expressed in the *Lee* case, *supra*, that lie detector tests "generally have not as yet been proved scientifically reliable." Nor do we intend to detract from the wisdom of the rule set forth in the cited annotation in 95 A.L.R. 2d that it is generally improper "to admit evidence that an accused had been willing or unwilling to take a lie detector test" or to comment thereon. Attempts to introduce such evidence or so to comment should be discouraged. Only in a case where, as here, the particular circumstances show no prejudice to the defendant, can the injection of such information into a criminal trial stand the test of reversibility.

■ The defendant's fourth contention is that the court erred in permitting the Commonwealth's Attorney, during his cross-examination of the defendant, to use a toy pistol "for demonstrative evidence."

The gist of the defendant's objection to such use is that it was not shown that the toy pistol was of the same caliber, size and kind as that with which Mrs. Barber was shot and that the imagination and prejudice of the jury were improperly excited.

It is true that no connection of the toy pistol with the death weapon was shown so far as caliber, size and kind were concerned. No contention was made that the two articles so corresponded and it should be obvious that the Commonwealth's Attorney was not attempting to show that the fatal wound was inflicted with a toy pistol.

It was the apparent purpose of the Commonwealth's Attorney, in the use of the toy pistol, to show that the gunshot injuries to Mrs. Barber's head, because of their very nature, could not have been inflicted in the manner which the defendant claimed.

That some article other than the actual death weapon had to be used for the demonstration resulted from the defendant's own actions. After Mrs. Barber's death, the defendant "discarded" the pistol with which she was shot and the iron bar with which she was beaten. The defendant told the police where the weapons were hidden but they could not be found.

It was within the sound discretion of the trial court to determine whether the use of the toy pistol for purposes of demonstration should be permitted. Under the circumstances, the granting of such permission did not constitute an abuse of discretion. *Peoples* v. *Commonwealth*, 147 Va. 692, 705, 137 S. E. 603.

■ The defendant next contends that the court erred in the granting of Instruction C-1. The instruction reads as follows:

"The Court instructs the jury:

"1. That every unlawful homicide is presumed, in the absence of other evidence, to be murder in the second degree, and that in order to elevate the offense to murder in the first degree the burden is upon the Commonwealth; and that in order to reduce the offense to manslaughter, or to show justification or excuse for the killing, the burden is upon the accused to carry the evidence forward in order to show extenuating circumstances, or justification unless it appears from the evidence of the Commonwealth.

"2. That upon a charge of murder malice is presumed from the fact of the killing. When the killing has been proven, and is unaccompanied by circumstances of palliation, the burden of introducing evidence to disprove malice is thrown upon the accused, if, however, upon consideration of all the evidence you have a reasonable doubt whether the killing was done with malice or not; you should not find the accused guilty of murder.

"3. That to constitute a wilful, deliberate and premeditated killing, it is not necessary that the intention to kill should exist for any particular length of time prior to the killing; it is only necessary that such intention should come into existence for the first time at the time of the killing, or at any time previously."

The defendant says that paragraph one of the instruction improperly placed the burden upon him of proving his innocence.

In *Dingus* v. *Commonwealth*, 153 Va. 846, 853, 149 S. E. 414, an instruction in language similar to that in paragraph one was offered by the defendant but refused by the trial court. This court held such refusal to be reversible error. It was noted that "this is an instruction which is nearly always given upon the motion of the prosecutor in every homicide case, and while it has been under criticism, it has frequently been held to be entirely appropriate." That ruling controls the disposition with respect to paragraph one of the instruction in this case.

The defendant next says that paragraph two of the instruction improperly told the jury that malice was to be presumed from the fact of the killing.

In *Wallen* v. *Commonwealth*, 134 Va. 773, 784, 114 S. E. 786, an instruction was granted on the motion of the Commonwealth containing language almost identical with that in the first sentence and the first clause of the second sentence of paragraph two. There it was said "we think the definition of malice contained in this instruction states the law with reasonable accuracy; and the last clause as to the burden of proof is in nearly the exact words of an instruction which was approved by this court in the case of *Hall* v. *Commonwealth*, 89 Va. 179, 15 S. E. 517, and in the case of *Horton* v. *Commonwealth*, 99 Va. 848, 38 S. E. 184." See also *Martin* v. *Commonwealth*, 184 Va. 1009, 1019, 1020, 37 S. E. 2d 43.

The defendant also argues that there was no evidence of malice on his part to support paragraph two of the instruction.

In *Brown* v. *Commonwealth*, 138 Va. 807, 813, 122 S. E. 421, an instruction in language similar to that in paragraph two was under

consideration. It was said that "the test . . . as to the correctness of the instruction complained of . . . is whether or not there was any theory, either presumptive or otherwise, which warranted the trial court in giving this instruction to the jury." See also *Roark* v. *Commonwealth*, 182 Va. 244, 252, 28 S. E. 2d 693.

Here, there was a strong theory, supported by the evidence, that the wound which caused Mrs. Barber's death was administered with a deadly weapon by the defendant, without circumstances of palliation. Thus, it was not error to tell the jury that malice was to be presumed from the fact of the killing.

The defendant does not point to any error in paragraph three of the instruction. Suffice to say that the language in that paragraph was expressly approved in *Bradshaw* v. *Commonwealth*, 174 Va. 391, 398-400, 4 S. E. 2d 752.

■ Finally, the defendant contends that the trial court erred in submitting the case to the jury upon a charge of first degree murder.

Here, the defendant argues that there was "no direct evidence that there was any premeditation or malice involved" in the death of Mrs. Barber and that the "Commonwealth's case . . . was a very weak one based on circumstantial evidence."

This contention is clearly without merit. The evidence establishes that Mrs. Barber met a violent death in her home on November 21, 1960. The defendant freely and voluntarily admitted that her death took place during the incidents of that day in which he was a direct participant.

Mrs. Barber suffered two wounds from the firing of the pistol bullets and five lacerations from the blows with the iron bar. The defendant admitted that it was he who delivered the blows with the bar, after his wife had been twice shot. He claimed, however, that her wounds either resulted from accident or were suffered while he was acting in defense of his own person.

But when the defendant's claims of accidental injury and of self defense are held against the light of all the evidence in the case, the incredibility of such claims becomes acutely apparent. Every physical fact in the case and every move the defendant made showed his guilt beyond a reasonable doubt.

In his statement to Sheriff Hodges, the defendant claimed that the pistol discharged and Mrs. Barber was struck by the bullets "while they were wrestling." In his testimony, the defendant asserted that Mrs. Barber was shot while the gun was in her possession

and "the gun went off while she was throwing her hands around" and "that it went off accidentally while [we] were struggling."

The testimony of the Chief Medical Examiner completely contradicts the defendant's versions of the shooting and tends to negate all of his claims. The testimony showed that the bullet wounds were in the back of Mrs. Barber's head, that there were no powder burns about her body and that the muzzle of the pistol "had to be in excess of three feet from the head of Sadie Barber when the shots were fired."

When the defendant struck Mrs. Barber with the iron bar, he was not defending himself. According to his own statement, the blows were administered after "she walked over to the telephone and said she was going to call the police."

After Mrs. Barber died, the defendant coldly tied her arms "so they would not flop around," wrapped her head in plastic bags "to keep the blood off the floor," dragged her by the legs "like you would pull a damned hog" and hid her body in the utility room.

Under cover of darkness, the defendant placed the body in the trunk of his car and, with it still there, drove the vehicle the next day to the hospital. That hospital visit was not for the treatment of any injury suffered at the hands of his wife, because he received none, but for the treatment of a long-standing cancerous condition.

After the hospital visit, he casually visited a friend with the ghastly evidence still in the trunk of his automobile. He then took the body to Dinwiddie County and hid it in an isolated spot "so no one would think he had killed her."

Then, in the further effort to conceal his crime, he reported his wife as a "missing person" to the police and later telephoned to inquire about the report, ostensibly to display his deep concern over the fact that his wife was missing.

When taken to view the body in Richmond, the defendant required no more than a cursory glance to identify it as that of his wife, because he already knew it had been discovered in the hiding place chosen by him in Dinwiddie County. And even then, he did not permit his pretended mask of innocence to slip when he made his cryptic remark that he "didn't know why anybody would kill Sadie."

The defendant "discarded" the death weapon and iron bar so they could not be found and used in evidence against him. He made a surreptitious but unsuccessful attempt to destroy evidence of his implication in the crime by removing his automobile from

the police department. When finally unable to conceal his guilt any longer, he confessed, "I killed her."

There is more in the record, but what has been recited should be amply sufficient to show that it was for the jury to say whether the fatal wound was suffered by Sadie Barber accidentally, whether it was administered by the defendant while acting in defense of his person, or whether it was caused by him as the result of his malicious and premeditated act.

The jury was under no obligation to find that the shots were fired "while she was throwing her hands around," or "while they were wrestling," or "while they were struggling" merely because the defendant said that the shooting occurred in one of those three ways and no witness directly testified to the contrary. *Adams* v. *Commonwealth*, 201 Va. 321, 324, 325, 111 S. E. 2d 396.

The jury was free to reject, as it did, the defendant's inconsistent claims and to accept all of the other evidence in the case which pointed clearly and conclusively to his guilt in inflicting the fatal injury with malice aforethought. *Ward* v. *Commonwealth*, *supra*, 205 Va., at pp. 570, 571; *Bradshaw* v. *Commonwealth*, *supra*, 174 Va., at p. 401.

We have considered every question raised by the defendant in his attempt to extricate himself from the consequences of his bizarre crime. We find his conviction to be without error and, accordingly, affirm the judgment of the trial court approving that conviction.

*Affirmed.*