GEORGE A. ROBINSON

V.

COMMONWEALTH OF VIRGINIA

Record No. 841744

March 7, 1986

Present: All the Justices

*George F. West, Jr. (James C. Clark; Murphy, McGettigan & West, P.C.; Land, Clark, Carroll & Mendelson*, on brief), for appellant.

*Marla Lynn Graff, Assistant Attorney General (William G. Broaddus, Attorney General*, on brief), for appellee.

THOMAS, J., delivered the opinion of the Court.

George A. Robinson was tried by a jury and convicted of two counts of capital murder and two counts of robbery. By order dated July 26, 1984, he was sentenced to four terms of life imprisonment.

On appeal, Robinson contends that the trial court erred in three particulars: (1) in failing to grant a mistrial or continuance where, in the midst of the trial, the prosecutor for the first time advised defense counsel of the existence of certain exculpatory evidence; (2) in allowing the Commonwealth's forensic expert to testify concerning information not previously disclosed to Robinson which

contradicted information contained in a forensic report that had been made available to Robinson; and (3) in not allowing defense counsel to impeach one of the Commonwealth's witnesses by asking that witness whether he had failed a police-administered polygraph test. We find no merit in any of Robinson's contentions. Therefore, we will affirm the judgments of the trial court.

In order to resolve the first issue, we must consider events leading up to the trial as well as evidence adduced at trial. On February 10, 1984, Elizabeth Elliott and Karl Von Lewinski were found stabbed to death in Elliott's townhouse in Alexandria. On February 13, 1984, the Alexandria police learned of the existence of a Maryland man, Charlie Ball, who had reported finding, on February 10, 1984, in Washington, D. C., a pillowcase containing items that appeared to come from Elliott's townhouse. The pillowcase and its contents were turned over to Alexandria police on February 13, 1984. Ball was then questioned.

As part of Ball's interrogation, he was asked to submit to a "lie-detector" test. During the test, Ball gave an explanation of how he came into possession of the pillowcase. According to the polygraph examiner, Ball's response on that point was deceptive. When Ball was confronted with this information he gave another explanation, which the police accepted. However, this second explanation was not measured by a lie-detector test. It was not until the fourth day of trial that defense counsel learned that Ball had failed the government's lie-detector test.

On February 23, 1984, the police, acting on a tip developed through a local "crime-stoppers" program, asked Robinson and his wife to come to the police station for questioning. While with the police, the Robinsons agreed to take lie-detector tests as part of the interview process. Mrs. Robinson, who was interviewed separately from her husband, was tested first. Her responses indicated deception. When she was confronted with this information, she implicated her husband in the murders.

Robinson was advised of his wife's statement, then allowed to talk to her by telephone. Thereafter, Robinson confessed. In effect, he made two conflicting confessions. First, he said that he, acting alone, killed both Von Lewinski and Elliott. In general, he explained that he stabbed Von Lewinski while Elliott was out of the room, then stabbed Elliott upon her return. However, at that time, the police did not believe that the crime had been committed by a single individual so they pressed Robinson to reveal his ac-

complices. Robinson then changed his confession; he said that two black men also participated in the crime and that they, not Robinson, did most of the stabbing. After making his statement, Robinson was arrested.

On April 13, 1984, Robinson filed two requests for information held by the Commonwealth. The first was a motion for discovery and inspection pursuant to then Rule 3A:14 (now Rule 3A:11) of this Court's rules. In that motion, Robinson requested, among other things, all written or recorded statements made by an accused or suspect to the police of which the Commonwealth's Attorney was aware; all written reports, tests, or other scientific reports concerning an accused or suspect known by the Commowealth's Attorney; and all written or recorded summaries of the substance of any oral statements known to the Commonwealth.

The second motion, also filed April 13, 1984, requested disclosure of exculpatory evidence. That motion sought any and all evidence or information that might be favorable to Robinson by reason of its exculpatory nature, or which might assist in the preparation of his defense.

By order dated April 24, 1984, the trial court essentially granted Robinson's motions. The Commonwealth filed its response on April 27, 1984.

In its response, the Commonwealth made available certain information concerning Charlie Ball. It listed him as a witness and set forth his name and address. The Commonwealth also released a forensic report which showed that Ball's pants and shirt had been examined. The forensic report also showed that a piece of paper on which Ball stood when he disrobed had also been analyzed.

The trial began on June 5, 1984. The Commonwealth relied on Robinson's confession as well as corroborative evidence developed from other witnesses. According to Robinson, he went to Elliott's townhouse twice on the day of the murder; the first time to discuss the fact that his car had been towed and the second time ostensibly to pay his rent. When Robinson came to Elliott's house the second time, he thought she was alone. Once inside, Robinson asked Elliott for a drink of water. When Elliott left the room to get the water, Robinson went over to a desk located in the living room where he thought Elliott kept money. While Robinson was seated, going through the desk, he was surprised by Von Lewinski

who asked Robinson what he was doing. Robinson replied "nothing." Von Lewinski grabbed Robinson. Robinson then grabbed a pair of scissors that were in the center of the desk and stabbed Von Lewinski in the chest "about three times." Von Lewinski ran. Robinson grabbed him from behind and stabbed him in the back. At that point Von Lewinski fell down.

Elliott returned from the kitchen while Robinson was bent over Von Lewinski. She asked what was wrong, then screamed. According to Robinson, he just stabbed her "about twice" he guessed. She fell down. Von Lewinski got up again but fell across a chair.

Robinson finished looking through the desk but found only "a little money." He then went through papers in a closet and a dresser drawer. He also went through papers in Von Lewinski's bedroom. Further, he ripped open Von Lewinski's pockets.

In addition to the evidence contained in the confession, the Commonwealth proved the following additional points: Robinson's second visit to Elliott's townhouse occurred about 9:38 p.m. on February 9, 1984. This was established by a witness who was, at that moment, talking long-distance from New York with Elliott. The witness, relying on telephone records, said she placed her call at 9:28 p.m. and had talked for about 10 minutes before Elliott was interrupted by a knock on the door. Elliott left the phone to answer the door. But the phone line remained open. When she returned to the phone she said "that a tenant had knocked on the door and he wanted to come in and pay rent." She also remarked "that the tenant apparently was not feeling well at all and requested to go straight to the bathroom."

The medical examiner testified that the wounds sustained by Von Lewinski and Elliott were consistent with wounds made by the pair of scissors that had been introduced as the murder weapon and further that the wounds inflicted upon Von Lewinski were similar to the wounds inflicted upon Elliott. This evidence suggests a single murder weapon and a single assailant.

The Commonwealth also proved that Robinson's fingerprints were on items taken from Elliott's townhouse; that Robinson pawned certain items taken from the house; and that Robinson had a cut on his hand in the same place that a glove found in the pillowcase was slashed. In essence, the Commonwealth proved facts which fit logically with Robinson's confession that he alone committed these crimes.

In the midst of the trial, on the fourth day, at a bench conference, defense counsel advised the trial court that he had just learned that morning from the Commonwealth's Attorney that Charlie Ball had failed a polygraph test administered by the police. Defense counsel told the court that he had talked to the polygraph examiner and learned of the questions that had been asked Ball and of the examiner's conclusion as to Ball's deceptive behavior. Defense counsel said he considered what he had learned to be exculpatory and considered that to be the reason for the disclosure from the Commonwealth's Attorney. Defense counsel then advised the court that he had told the Commonwealth's Attorney that the new material raised "evidentiary questions in our minds as to how to deal with that as well as some questions as to how it fits into our case." Defense counsel then made reference to the need for a continuance but he did not move for one; he stated as follows:

> [I]n the event Mr. Ball goes on the stand, I feel I want to use that conversation in some fashion. I am going to need *some time in the context of a continuance or a substantial recess* in order to work out some of the problems which have arisen.

(Emphasis added.) The Commonwealth's Attorney replied that the information was exculpatory because Ball had "flat out flunked" the test. The Commonwealth also noted, however, that the information was "not admissible in any way."

The trial court made clear that its position on the use of polygraph tests was that "we do not let them in evidence." In response to the court's comment, defense counsel replied that that was the reason he wanted more time so he could develop Robinson's "position in order to persuade the Court."

Then, with regard to defense counsel's asserted need for time, the trial court suggested that the Commonwealth delay calling Ball until the next week so as "to give [defense counsel] the weekend to see a transcript of what [Ball] said and to make some decision as to how to handle it." Significantly, defense counsel made no objection to the plan suggested by the trial court.

However, when the trial resumed on Monday, defense counsel made further reference to the material concerning Ball. Defense counsel told the court that in listening to the tape over the weekend, "a number of significant things" came to his attention for the

first time. He summed up his view of the Ball information as follows:

Here's a man who has explained and described himself as a violent man; who's found in possession of the things, and who fails the polygraph test; who I believe evidence in this case is going to show when he was confronted by the Alexandria police prior to this conversation had human blood on his clothes. And all of a sudden he just vanishes into the woodwork.

Defense counsel then said:

[W]e need more time to follow up on the points that the police didn't follow up on. We need to find out if they did follow up what the results of those inquiries are. . . . We absolutely need more time to know exactly what it is that brought the investigation or the attention of Mr. Ball to an end at that point in time.

The trial court asked whether defense counsel could obtain the information through cross-examination. Defense counsel said he did not know whether he could, and expressed fear that he could not, through cross-examination, find out from the witness either his background or his psychiatric condition. Defense counsel went on to state as follows:

I'm not going to know what he's lying about if I haven't had a chance to investigate his psychiatric condition, his friends, what he did. I haven't had a chance over the weekend to find out what all the background is. So I don't know how to ask the follow up questions. That's the problem.

The trial court treated defense counsel's remarks as a motion for mistrial or continuance; the court denied the motion.

When Ball took the witness stand, he was cross-examined extensively by defense counsel. Though defense counsel had expressed concern that without further investigation it would be difficult to develop information about Ball's background and psychiatric condition, as things developed, however, Ball proved to be forthcoming as a witness. He admitted telling the Commonwealth's Attorney that he was not going to testify unless his pet

dog — which had been taken from Ball's parked car by animal welfare authorities — was released. He admitted being interested in locks since he was a child. He said he learned a great deal about the victims from the contents of the pillowcase. He admitted having been convicted of assault and battery upon his girl-friend. He admitted he attends a psychological therapy class because he is on probation from the assault and battery charge. He admitted smoking marijuana. He also admitted undergoing counselling as an eleven or twelve-year-old child.

Ball further admitted that 10 years earlier it was recommended that he take drugs to control his temper. He admitted too that when he first told police how he came into possession of the pillowcase they told him that he was being deceptive and had omitted something. He admitted telling the police officers that had he committed the murders he would have used a hammer or gun. Finally, he admitted telling the police that they could not scare him with the electric chair.

On brief and in oral argument, Robinson explained his need for a continuance on the grounds that the information concerning Ball might have led to evidence of substantive value and evidence that could be used for impeachment purposes. He said that the facts concerning Ball's knowledge of the victims, his knowledge of the interior of the victim's house, his history of assaultive behavior, his psychiatric problems, his possession of the murder weapon and stolen articles shortly after the murder, and the presence of blood on his clothes when he was questioned by police "strongly suggest that he was involved in or responsible for the crime. Moreover, certain of these facts serve dramatically to undercut Ball's credibility. Significantly, even if those facts were not accepted at face value as favorable to Robinson, they raise provocative fact issues which require further development."

The essence of Robinson's position concerning his need for a continuance is that with more time he could have shown that he was not at the Elliott apartment by himself. Robinson contended that

[t]he defense was denied the opportunity of effectively using or further developing these facts to place Ball or someone else other than Robinson at the crime scene, and to raise doubts as to whose hand held the lethal weapon and inflicted the fatal wounds. Robinson was thus precluded from raising

reasonable doubt about his own guilt or about the degree of his culpability.

Robinson stated that he was prejudiced by the failure to receive a continuance because he "did not have sufficient time to evaluate, develop and use this evidence effectively."

■ The question whether Robinson was entitled to a continuance is inextricably bound up in the question whether the information concerning Ball was exculpatory and whether the delay in advising Robinson of the information prejudiced him. We have little trouble with the first issue. Robinson had filed both a discovery request and a motion for exculpatory material. Either or both were broad enough to encompass the material concerning Ball that was revealed while the trial was underway. Moreover, it is clear that the information was exculpatory. At the very least, it provided fertile ground to impeach Ball. The impeachment value alone makes the information exculpatory. *See United States* v. *Bagley*, 473 U.S. ____, ____, 105 S.Ct. 3375, 3380 (1985).

The more difficult question here concerns the issue of prejudice. The leading case in the area is *Bagley*. Bagley was indicted on federal narcotics and firearms charges. He filed certain pre-trial discovery requests in which he sought, among other things, information concerning any deals or inducements made with or to the government witnesses. The government's response did not disclose any such deals or inducements. Indeed, the government produced signed affidavits from its witnesses which recited that the affidavits were made without threats or promises.

Bagley was convicted of the narcotics charges but found not guilty of the firearms charges. Thereafter, he filed a Freedom of Information Act request and learned that the government's two main witnesses had signed contracts with the government for payment for information. Bagley moved to vacate his sentence on the ground that the failure to disclose the contracts, which Bagley could have used to impeach the two government witnesses, violated his right to due process under *Brady* v. *Maryland*, 373 U.S. 83 (1963). The issue in *Bagley* was the standard of materiality to be applied in determining whether a conviction should be reversed due to the prosecutor's failure to disclose requested information.

In *Bagley*, the trial court denied the motion to vacate because it found, beyond a reasonable doubt, that had the existence of the contracts been disclosed during trial the disclosure would have

had no effect upon the outcome. The Court of Appeals for the Ninth Circuit reversed the trial court on the ground that failure to provide the requested information impaired Bagley's ability effectively to cross-examine the two government witnesses. The Court of Appeals said that situation required automatic reversal. The United States Supreme Court reversed.

■ The Supreme Court said that in *Bagley* there was no direct restriction on the scope of cross-examination:

> The defense was free to cross-examine the witnesses on any relevant subject, including possible bias or interest resulting from inducements made by the Government. The constitutional error, if any, in this case was the Government's failure to assist the defense by disclosing information that might have been helpful in conducting the cross-examination. As discussed above, such suppression of evidence amounts to a constitutional violation only if it deprives the defendant of a fair trial. Consistent with "our overriding concern with the justice of the finding of guilt," *United States* v. *Agurs*, 427 U.S., at 112, 96 S.Ct., at 2401, *a constitutional error occurs, and the conviction must be reversed, only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial.*

473 U.S. at ____, 105 S.Ct. at 3381 (emphasis added). The Supreme Court went on to explain that materiality means that the undisclosed information must have an effect upon the outcome of the case: *"The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.* A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Id.*, 473 U.S. at ____, 105 S.Ct. at 3384 (emphasis added).

■ Robinson fails to show, as *Bagley* requires, that had the information been disclosed earlier there is a reasonable probability of a different result. Indeed, Robinson's entire argument on this point is contained in this conclusory statement: "Robinson's inability to use these *Brady* materials was such a tremendous disadvantage that there is a reasonable probability that the result of the trial would have been different had the materials been timely produced."

To resolve the issue of prejudice, *Bagley* requires us to assess the reasonable probability of a different result "in light of the totality of the circumstances and with an awareness of the difficulty of reconstructing in a post-trial proceeding the course that the defense and the trial would have taken had the defense not been misled by the prosecutor's incomplete response." *Id*. Reviewing the record in light of that standard, we compare the evidence adduced at trial with what Robinson contends could have been adduced had he been granted a continuance to consider the best use of the exculpatory evidence concerning Ball. The comparison makes clear that the outcome of this trial would not have been affected by an earlier disclosure of the Ball information.

Robinson divides his argument concerning the Ball information into a discussion of the information's impeachment value and of its substantive value. We will use the same division. With regard to impeaching Ball, Robinson's counsel successfully adduced almost everything that he feared he would not be able to develop. Ball proved to be an open and candid witness. He admitted his violent behavior, his use of drugs, his conviction of crime. His credibility was questioned in almost every way possible. He was even asked whether the police accused him of being deceptive when he first told how he came into possession of the pillowcase from Elliott's house; he admitted this. The only thing that did not come out during Ball's cross-examination is that he failed a police polygraph test on the question of how he came into possession of the pillowcase. First, this question would have been a mere elaboration upon the question of Ball's having given a deceptive response to the police regarding his discovery of the pillowcase. Second, the reason Ball was not questioned specifically about failing the polygraph had nothing whatever to do with the time the information concerning Ball was made known to Robinson's counsel. In light of the trial court's ruling regarding reference to polygraph examinations, Robinson's counsel would not have been allowed to ask that direct question even if he had known earlier of Ball's failure. Thus, we conclude that from the standpoint of using the Ball information for impeachment, there is no reasonable probability that an earlier disclosure would have resulted in a different outcome.

With regard to the substantive value of the Ball information, we reach the same conclusion. On the substantive point, Robinson contends that with more time to evaluate the Ball information he

might have been able to show that Ball or someone else was present and participated in the murders. Robinson's counsel submits that if he could have done this, then the outcome might have been different. In making this argument, Robinson overlooks two important pieces of evidence, both of which make absolutely clear that Robinson's theory of the substantive value of the Ball information is so much wishful thinking.

The basis for the theory of another criminal agent is the second part of Robinson's February 23, 1984 statement to the police. As described above, when Robinson was simply asked to tell what happened he stated that he and he alone stabbed to death both Elliott and Von Lewinski. However, the police investigators pressed Robinson about accomplices and Robinson then said that he and two others pushed their way into the Elliott apartment and perpetrated the crimes. He said that one accomplice was named Skeeter. He said Skeeter *was black with a complexion a little darker than his own.* He said the other accomplice was named John. He said John *was black and described his complexion as brown.* Both of the men who Robinson said participated in the crimes were described as black. Ball is white. In his statement, Robinson specifically denied that there were "two white guys" with him. Thus, by Robinson's own statement, Ball could not have been an accomplice. Robinson's own statement makes absolutely clear that there was no basis to contend that Ball was involved in the crimes. Pursuing that theory would have led nowhere.

Next, again on the substantive point, Robinson contends that the Ball information, if provided earlier might have established that someone else was present with Robinson, even if it was not Ball. Robinson's statement coupled with certain uncontroverted testimony establishes that the other-accomplice theory was mere fantasy.

In the statement in which Robinson admitted being the sole perpetrator of the crimes he said he went to Elliott's apartment twice on the day of the murders, first about 6:30 p.m. to talk about a car that had been towed and second about 8:30 p.m. In the portion of the statement in which he implicated others, Robinson again said he went twice to Elliott's house. But this time he did not give times. Nevertheless, since in the second statement he said he ran home around 9:00 p.m. or 8:30 p.m., it appears then that he still contended that he went once early and then later with Skeeter and John. He says that the second time he went to the

apartment he knocked on the door and the other two ran in and grabbed Elliott. This cannot be true.

Elliott was alive and talking on the phone as late as 9:38 p.m. on February 9, 1984. At that time, her conversation was interrupted by a knock on the door. She put the phone down, went to the door, let *one tenant* in and returned to end her phone conversation. We know that Elliott let one person in and not three because she went back to the telephone and said "that a tenant had knocked on the door and he wanted to come in and pay rent." She then added "that the tenant apparently was not feeling well at all and requested to go straight to the bathroom." Elliott allowed a single person into her home just before she was killed. Had two people charged in when she opened the door her caller from New York would have known something was amiss because Elliott could not have returned to the phone. Thus, there was nothing that could have been gained by pursuing the theory of an accomplice other than Ball.

We hold, with regard to the first issue, that Robinson was not prejudiced by the disclosure at trial of the information concerning Ball and, therefore, the trial court did not abuse its discretion in denying Robinson a continuance to give him more time to consider the impact of the Ball information.

On another issue, Robinson contends that the trial court erred in permitting a forensic scientist, who testified on behalf of the Commonwealth, to tell the jury that certain test results on two hairs taken from one of Von Lewinski's hands were in error. More specifically, in a May 7, 1985 report, the witness had stated that the two hairs found in Von Lewinski's hand were two strands of "characteristically Caucasian head hairs." At trial, the witness was permitted to say that upon reexamining the two hairs that morning before her testimony, she now concluded that one hair was a strand of animal hair while the other was a strand of gray hair consistent with the victim Elliott's hair.

Robinson said his defense strategy was gutted by the changed testimony. He contends that the test done on the day of the witnesses testimony could have been done earlier, that the new results should have been excluded, or that Robinson should have been given a continuance and the means to conduct his own tests.

Robinson submits that the changed testimony amounted to a discovery violation because he was not provided with these new test results prior to trial. Looking at the matter from the stand-

point of a discovery violation, Robinson acknowledges, citing *Davis* v. *Commonwealth*, 230 Va. 201, 335 S.E.2d 375 (1985), that he is not entitled to relief unless he shows that the violation prejudiced his substantial rights. In that regard, it is noteworthy that Robinson sought to rely on the early report of two Caucasian head hairs to support the theory of a white assailant. Robinson stated on brief that the defense preparation and presentation was premised on the theory that "a Caucasian assailant, such as Ball, was the murderer." Robinson says that the change from two Caucasian head hairs to one animal hair and one gray Caucasian head hair consistent with the victim Elliott's completely undermined his theory and consequently, he was prejudiced in his substantial rights.

There are several responses to Robinson's argument. First, the Commonwealth cannot disclose what it does not have. The forensic expert changed her conclusions concerning the hairs on the morning she was to testify. The new results were made known to Robinson prior to the forensic expert taking the stand. Thus, at the threshold, we find no discovery violation.

However, even if we assume a discovery violation, there was no prejudice to defendant's substantial rights. As we noted in the discussion concerning the substantive value of the Ball information, the theory of a white assailant is in direct conflict even with Robinson's statement that he had accomplices. Consequently, the fact that the changed testimony made it more difficult for Robinson to advance a theory in conflict with his own statement cannot be viewed as prejudicial to his rights.

We hold, therefore, with regard to the issue concerning the forensic expert's testimony that the trial court did not err in admitting testimony of the new results.

The final issue in this appeal concerns the trial court's ruling that Robinson could not ask Ball the specific question whether Ball failed a police polygraph examination when asked how he came into possession of the pillowcase containing items from the murder scene. Robinson concedes that the results of polygraph tests are inadmissible on the question of guilt or innocence. *See, Odum* v. *Commonwealth*, 225 Va. 123, 132, 301 S.E.2d 145, 150 (1983); *Skinner* v. *Commonwealth*, 212 Va. 260, 262, 183 S.E.2d 725, 727 (1971). Nevertheless, Robinson contends that where, as here, the results of a polygraph test are sought to be used for impeachment purposes, then the use should

be permitted. In support of his argument, Robinson cites *United States v. Hart*, 344 F. Supp. 522 (E.D.N.Y. 1971).

In a long line of cases, spanning almost thirty years, we have made clear that polygraph examinations are so thoroughly unreliable as to be of no proper evidentiary use whether they favor the accused, implicate the accused, or are agreed to by both parties. *See, e.g., Odum; Skinner; Barber v. Commonwealth*, 206 Va. 241, 142 S.E.2d 484 (1965); *Lee v. Commonwealth*, 200 Va. 233, 105 S.E.2d 152 (1958). The point of these cases is that the lie-detector or polygraph has an aura of authority while being wholly unreliable.

Though we have not heretofore addressed the impeachment question, we cannot perceive why our concern about the unreliability of polygraph results should give way simply because the results are used for impeachment purposes. To ask a witness whether he failed a lie-detector or polygraph test is tantamount to asking a witness whether he lied even though a positive result on the polygraph may be caused for any number of reasons. The mention of polygraphs in the presence of the jury impermissibly suggests that there is a scientific way to find the truth where in reality, in our system of justice, the jury decides what is true and what is not. In light of our continuing concern over the use of polygraph exams in any court proceeding in Virginia, we reject the approach taken by the district court in *Hart*.

With regard to the polygraph issue, we hold that the trial court did not err in preventing Robinson from mentioning that Ball failed his polygraph examination.

For all the foregoing reasons, the judgments appealed from will be affirmed.

*Affirmed.*

COMPTON, J., dissenting.

In this direct appeal of convictions for capital murder and robbery, the central issue is whether the trial court erred in refusing to grant a continuance when clearly exculpatory information was withheld from the defendant by the prosecutor until the fourth day of trial. The Court recently has decided three direct appeals of criminal convictions which, in my view, are controlling on the issue presented, none of which the majority in this case relies

upon. Instead, the Court adopts the rule of what it says is "the leading case in the area," *United States* v. *Bagley*, 473 U.S. ____, 105 S.Ct. 3375 (1985), a 5-3 decision in a collateral, not direct, attack of a criminal conviction in which refusal of a continuance was not even an issue. I believe the "leading" cases on the subject of continuances as related to disclosure of exculpatory information are the following decisions of the Supreme Court of Virginia: *Lomax* v. *Commonwealth*, 228 Va. 168, 319 S.E.2d 763 (1984); *Gilchrist* v. *Commonwealth*, 227 Va. 540, 317 S.E.2d 784 (1984); and *Cox* v. *Commonwealth*, 227 Va. 324, 315 S.E.2d 228 (1984).

The effort to convict Robinson of the capital murders depended upon whether the accused was the sole perpetrator of those crimes. In other words, the prosecutor wanted to establish that defendant was the sole other individual at the scene, in addition to the victims, in order to show that defendant was the "triggerman." Only the actual perpetrator can be convicted of capital murder in the commission of robbery while armed with a deadly weapon. *Johnson* v. *Commonwealth*, 220 Va. 146, 149, 255 S.E.2d 525, 526-27 (1979). Thus, the Commonwealth knew from the outset that if anyone else was placed at the scene at the time of the murders, the chance of convicting defendant of the capital murders would be subverted substantially. Likewise, the defendant's main line of defense was to show that others were there when the victims were killed. The defendant himself implicated two others during a statement given to the police.

In April before the June trial commenced, the court below ordered the prosecutor to disclose all information "which might be favorable to the Defendant by reason of its exculpatory nature, including without limitation . . . [f]acts tending to show that someone other than the Defendant committed any or all of the elements of the alleged offense," and to disclose "information . . . which might be favorable to the Defendant by reason of its propensity to impeach, diminish, and/or discredit the credibility and/or reliability of any witness intended to be called to testify on behalf of the Commonwealth." Because of the prosecutor's failure to disclose exculpatory evidence relating to Ball, defense counsel went into trial justifiably believing that Ball was not the source of any information of an exculpatory nature.

On the morning of the fourth day of trial, a Friday, the Commonwealth's Attorney advised defense counsel for the first time of the existence of Ball's written statement, the tape recording of his

interrogation, and the polygraph examination by police investigators. Upon review of the materials over the weekend between days of the trial, defense counsel learned for the first time that the police were of opinion that Ball had lied about his connection with the fruits of the crimes, that he was familiar with the interior of the premises where the killings occurred, that he had an extended history of being a violent person requiring therapy for temper control, that he currently was under psychiatric treatment, that he had been admitted in the past to psychiatric wards, that he had intimate knowledge of the victims' backgrounds, and that he had knowledge of the appearance of the homicide scene even though information about the scene had not been made public. On Monday, before the trial resumed, the court denied defendant's motion for a continuance as well as a mistrial. The basis for the motion was that the written statement, tape recordings, and polygraph results had been withheld improperly, and that defense counsel had no opportunity over the weekend to investigate further the information just revealed by the prosecutor. During closing argument, the prosecutor depicted Ball as a public-spirited citizen, argued his credibility, and criticized defense counsel's failure to have sufficiently impeached him.

In *Cox v. Commonwealth, supra,* we reversed the trial court's action in refusing a continuance where defendant was denied access to evidence material to her defense. There, we said: "In our adversary system of criminal justice, all relevant facts must be available to both the prosecution and the defense in order to preserve the system's integrity." 227 Va. at 328, 315 S.E.2d at 230.

In *Gilchrist v. Commonwealth, supra,* we reversed the trial court for failure to grant a continuance when defendant was denied reasonable time to prepare for trial following discovery of evidence. There, we stated that "an accused has a constitutional right 'to call for evidence in his favor,' Va. Const. art. I, § 8, which includes the right to prepare for trial by procuring both testimonial and documentary evidence . . . . In order to prepare for trial, an accused and his counsel must have sufficient time to investigate the case and to evaluate the evidence that is procured." 227 Va. at 545-46, 317 S.E.2d at 787.

In *Gilchrist,* we also pointed out that, although the decision whether to grant a continuance is discretionary, the court must exercise its discretion cognizant of the provisions of the Bill of Rights, which secure to a person accused of a crime a fair and

impartial trial; thus, in ruling on such a motion, the court must safeguard the defendant's right to call for evidence in his favor. 227 Va. at 546, 317 S.E.2d at 787. Quoting from *Smith* v. *Commonwealth*, 155 Va. 1111, 1117, 156 S.E. 577, 579 (1931), we said: " 'An ideal system of laws would be one in which speedy justice is administered, but justice and not speed should be its paramount purpose.' " 227 Va. at 546, 317 S.E.2d at 787.

In *Lomax* v. *Commonwealth, supra,* this Court held that the trial court erred in refusing to grant defendant's motion for a continuance when he was denied the right to explore and develop evidence critical to his defense. There, the Court stated that when a trial court orders discovery, the prosecutor has the duty to disclose the materials in sufficient time to afford the accused an opportunity to make use of such materials and that a refusal of a continuance under those circumstances "denied the defendant a basic right to call for evidence in his favor, which prejudiced his trial." 228 Va. at 168, 173, 319 S.E.2d at 766.

I am of opinion that in the present case, where admittedly exculpatory information was withheld, the trial court erred, according to Virginia law, in failing to grant a continuance to enable defense counsel to assess and develop the evidence for trial, and that such failure prejudiced the substantial rights of the defendant. *See Davis* v. *Commonwealth,* 230 Va. 201, 204-05, 335 S.E.2d 375, 377-78 (1985). Even accepting the majority's federal test, I would hold, using their language, that suppression of the information undermined confidence in the outcome of the trial and that a reasonable probability exists that the result of the proceeding would have been different. As defendant points out, the multiple assailant theory was supported by his own statement to the police. The information revealed for the first time during the trial inexorably points to Ball's involvement: *e.g.,* his criminal record, his psychiatric history of violent behavior, his detailed knowledge about the victims and crime scene, and his lying during police interrogation. Because of the trial court's action, the defense was denied the opportunity to evaluate this information, utilize it, and explore the likelihood that it would lead to other information beneficial to the defense. In sum, defendant was precluded from raising a reasonable doubt about the degree of his culpability. This is prejudice to the substantial rights of the defendant.

Therefore, I would reverse the convictions and remand the case for a new trial.

POFF and STEPHENSON, JJ., join in dissent.