COURT OF APPEALS OF VIRGINIA

Present:  Chief Judge Moon, Judges Benton and Coleman
Argued at Salem, Virginia


ERNEST EDWARD BRUMMETT

v.         Record No. 0485-94-3            MEMORANDUM OPINION
                                        BY JUDGE SAM W. COLEMAN III
COMMONWEALTH OF VIRGINIA                      JANUARY 11, 1996

              FROM THE CIRCUIT COURT OF THE CITY OF DANVILLE
                        James F. Ingram, Judge

          Glenn L. Berger (Shreve & Berger, on brief),
          for appellant.

          Robert B. Beasley, Jr., Assistant Attorney General
          (James S. Gilmore, III, Attorney General, on brief),
          for appellee.


     Ernest Edward Brummett appeals his convictions on two

charges of forcible sodomy, one charge of inanimate sexual

penetration, and two charges of aggravated sexual battery.  The

charges were based on allegations of numerous sexual acts

committed against W and K, two eleven-year-old girls.

     The defendant contends that the trial court erred by

refusing to sustain his pretrial motion that the Commonwealth

disclose copies of the victim's statements to the police,

refusing to admit forensic evidence showing that semen found on a

bedspread was not from him, refusing to admit the full transcript

of his statement to the police to rebut the Commonwealth's use of

part of the statement, and admitting a drawing W made of a

vibrator.  We hold that the trial court erred by not requiring

the Commonwealth to provide the defendant with W's statements to

the police, and by not admitting the forensic evidence which proved that the semen was not from him.  The errors were not harmless.  Accordingly, we reverse the defendant's convictions and remand for such further proceedings as the Commonwealth may be advised.

## I. Pretrial Discovery

The defendant filed a pretrial discovery motion requesting copies of three statements W gave police and one statement K gave police.  The Commonwealth's attorney provided the defendant a summary of "favorable evidence and statements," which was a summary of the girls' statements, but did not allow the defendant to examine the victim's verbatim statements.  After reviewing transcripts of the verbatim statements in camera, the trial court ruled that the statements were not exculpatory and overruled the defendant's motion to obtain the statements.

## II.  Facts

The Commonwealth relied on the testimony of W and K to prove the charges.  No medical or other physical evidence corroborated the victims' testimony.

W's mother worked for the defendant for nine months beginning in March of 1987.  She left her job with the defendant around December 1988 or January 1989, but in March 1988 the defendant had agreed to help her care for W.  From March 1988 until June 30, 1993, W regularly stayed with the defendant after school while her mother was at work, during which time she spent

several nights at the defendant's home.

W testified that beginning shortly before her sixth birthday in 1987 and continuing until she filed a complaint on July 1, 1993, the defendant committed numerous sexual assaults against her. Prior to her sixth birthday, the defendant attempted to "french kiss" her, and approximately two months after that incident, he attempted to remove her pants. About five months later, the defendant exposed his penis to W, removed her pants, and rubbed her vagina with his fingers. The defendant engaged in similar conduct "once or twice a week" thereafter. Sometimes he touched her genitals or fondled her breasts. Other times, he placed his penis on her genitals and ejaculated, or placed "it up to [her] mouth." The defendant also tied "W" to a chair with rope and placed his penis between her legs on several occasions. W testified that the defendant never penetrated her vagina with his penis.

W further testified that when she was seven or eight years old, the defendant began to place his penis in her mouth. Also, when W was nine, the defendant began to lick her genitals, and when she was ten, he placed a vibrator in her rectum and vagina. In addition, the defendant showed W movies containing graphic sexual material, and on one occasion, performed on W a sexual act depicted in one of the movies.

On June 30, 1993, W and her friend K spent the night at the defendant's house and swam in his pool. W testified that the

-3-

defendant asked the girls if they wanted to go "skinny dipping" with him, which they refused. When K went inside the house to use the bathroom, the defendant grabbed W, removed her bathing suit, and placed his penis between her legs. After K returned, the girls swam for a few more minutes before leaving the pool. W saw the defendant attempt to remove K's suit as he helped her get out of the pool.

Later that evening, W and K were in the defendant's living room. W was lying on a mattress on the floor and K was lying on a couch. W testified that the defendant came into the room and that she heard him whispering to K. The defendant then approached W and touched her breasts and genitals as she lay under some covers on the mattress. W kicked the defendant and he went back to K, where he whispered in K's ear and pulled his pants down, exposing his penis to K. K kicked the defendant, but he was able to remove her pants. Although W did not see anything else, she "heard somethin[g] tear," and heard the defendant tell K, "you know you want it." The defendant came back to W and "tried to mess with [her]" again, but she kicked him and he left the room.

After the defendant left, the girls went outside and K told W that the defendant "had been messing with her . . . all the times that [she had visited his house]." The girls decided to run away and went inside the house to gather some items. They walked to K's babysitter's house and called K's parents.

In the course of her testimony, W stated that on several occasions, W and K had showered at the defendant's house and that he had reached into the shower and touched their private parts. She also claimed that she witnessed the defendant attempt to place his penis between K's legs on one occasion.

K testified that she began visiting W at the defendant's home in the spring of 1993. She claimed that the defendant touched her and W on the chest and between their legs while they showered, that he touched their private parts while they swam in the pool, and that he showed them "dirty movies." K also testified that on June 30, 1993, the defendant grabbed her between the legs while she was in the pool. Later that night, he attempted to remove her shorts while she lay on the couch in his living room, and as a result he ripped her underwear. He also asked her if he could "put [his] `thing' in [her]."

The defendant denied all the allegations. He offered the testimony of two forensic experts who testified to the lack of physical evidence supporting the allegations. In addition, he offered the testimony of two of W's teachers, who stated that they had not observed any problems with W and that she appeared to have a normal relationship with the defendant. One of the teachers testified that she had visited the defendant and W at the defendant's home and had not noticed any problems between the defendant and W.

T, the defendant's seven-year-old nephew, testified that W

had pulled his pants down and climbed on top of him two weeks before the complaint was filed against the defendant. The defendant testified that he discovered the children in this position and he admonished them. T's father confirmed that the defendant had reported this incident to him. According to the defendant, W had fabricated the allegations of sexual assault against him because she feared the defendant would tell her mother about the incident with T.

During the trial, the court refused to allow the defendant to introduce results from DNA tests which showed that semen stains found on a bedspread recovered from the defendant's home were not from the defendant. The trial court also refused to allow the defendant to admit the full text of a statement he gave to the police in order to rebut the Commonwealth's use of a portion of that statement. Furthermore, the court, over the defendant's objection, admitted a drawing W made of the vibrator that she claimed the defendant used on her.

### III. The Statements

An accused has no general right to discovery in criminal cases. Stotler v. Commonwealth, 2 Va. App. 481, 483, 346 S.E.2d 39, 40 (1986). Nonetheless, the prosecution must disclose all evidence favorable to a defendant and material to either guilt or punishment. Brady v. Maryland, 373 U.S. 83, 87 (1963); MacKenzie v. Commonwealth, 8 Va. App. 236, 243, 380 S.E.2d 173, 177 (1989). When a prosecutor is uncertain about whether evidence is, or

will prove to be, exculpatory, the prosecutor withholds disclosure of that evidence at the risk of ultimately wrongfully depriving an accused of favorable evidence to which the accused is constitutionally entitled.

Where the prosecutor is in doubt about whether evidence is exculpatory, the prosecutor may submit the evidence to the trial judge for an in camera review in order to determine whether the evidence must be disclosed. Cherricks v. Commonwealth, 11 Va. App. 96, 102, 396 S.E.2d 397, 400 (1990). Nevertheless, at that juncture, the trial judge, who probably is not as well informed about the issues in the case as the attorneys, may not be able to ascertain whether the requested material is or will be germane to determining guilt or punishment. However, evidence is exculpatory under Brady and, therefore, is discoverable if the defendant could have used it for impeachment purposes. United States v. Bagley, 473 U.S. 667, 676 (1985); Robinson v. Commonwealth, 231 Va. 142, 150, 341 S.E.2d 159, 164 (1986); MacKenzie, 8 Va. App. at 243, 380 S.E.2d at 177.

The defendant claims that W's statements to the police were exculpatory because they were inconsistent with each other and with testimony elicited at trial. These inconsistencies were exculpatory and material because, according to the defendant, the Commonwealth's case depended almost exclusively upon W's credibility. For example, the defendant notes that at one point during W's statements she indicated that the defendant had never

placed his penis in her mouth, which would have exonerated the defendant on the sodomy charge if believed by the jury. Therefore, the defendant contends that this is but one example of how his right to a fair trial was compromised by the Commonwealth's failure to provide him with verbatim copies of the statements.

W's statements contained several other inconsistencies. Most significantly, W's statements to the police that the defendant forced her to engage in fellatio were inconsistent. On July 1, 1993, W gave the following responses during questioning by Detective D.L. Goss:

Q. In the last few years? Has [the defendant] ever asked you to put his [penis] in your mouth?

A. Yes.

Q. You ever done that?

A. No. The same thing as that. I tried not to, but he would take and he'd push my head down there toward it, and I'd would [sic] be jerking my head away, when, when he'd put my head back, and sometimes I'd jerk it away, and it popped, my neck would pop.

* * * * * * *

Q. . . . And he's never made you put it, actually put it in your mouth?

A. No.

* * * * * * *

Q. But you never had, never have had his [penis] in your mouth?

A. Not, not except the times there when he would push it on me. He would push it in my mouth.

Q. Then you have had his [penis] in your mouth?

-8-

A. Yes.

Q. What did you do with it?

A. I would try to pull back, and, and it was "yucky tasting," and everything, and I tried to get, pull back, and he would--

On July 9, Detective Nancye Snow took a second statement from

"W":

Q. O.K.  Ah, another important question.  Did he put his penis in your mouth?

A. Yes, but I didn't want him to, and--

Q. Well, honey, we know you didn't want him to.  We just have to have the facts that he did.  You know, we know you were unwilling, but you are not on trial.  We just have to have all the facts, and get everything lined up.  O.K.  Ah, the first time he did this, how old were you?

A. I think I was about, I was getting to turn 5 [unintelligible]--

Q. So somewhere around October, before your 5th birthday, he made you take his thing in your mouth?

A. Yes.

* * * * * * *

Q. O.K.  Ah, awhile ago, I asked you if he held you down when he ah, put his penis in your mouth.  Did he ever hold your head?

A. Yes, he--

Q. Make you move your head in a certain way, or something like this?

A. He would take, like sometimes he would be standing up, and he would make me get on my knees, and he would hold the back of my hand up to his thing, and stick it in my mouth.  And he would tell me to try to take out his thing, and I would try to, I'd be trying to get it out of my mouth, and he would take and hold his thing, and push some more into my mouth.

Although W asserted in each of her statements that the defendant had forced her to commit fellatio, her initial negative response, given on July 1, to the question of whether the defendant placed his penis in her mouth was crucial evidence to the defendant's case, not only for impeachment purposes, but also for supporting his claim that he did not commit the act.  See Bowman v. Commonwealth, 248 Va. 130, 133, 445 S.E.2d 110, 112 (1994) (noting the defendant's claim that the undisclosed police report "called [the police officer's] credibility into question" and supported the defendant's claim of misidentification).

W's statements to the police on July 1 and July 9 were also inconsistent with her trial testimony about what happened on the night of June 30, 1993.  In her pretrial statements, W claimed that she was asleep on a mattress in the defendant's living room, and that he woke her when he rubbed her private parts.  W stated that she "got away from" the defendant and checked on K, who was lying on a couch in the living room.  K then asked W to accompany her outside, and once outside, K told W that the defendant "had been doing things to her, like rubbing her [private parts], and feeling her breasts, and stuff like that."  At trial, however, W testified that she was awake before the defendant came over to where she was lying and began to rub her.

    Q. Okay.  And then did the defendant come in the room?

    A. Yes sir, he came in the room, and he went over to
    [K], and I heard a whispering, and then after he went
    over to [K], he came over to me, and he took and
    reached up under the covers, and tried to rub me
    between my legs --

W also testified that after the defendant left her alone she saw him go back to where K was, take out his penis, and attempt to pull down K's pants.  W claimed that she heard K tell the defendant to stop and that the defendant replied, "Oh, you know you want it."  In her pretrial statements, W did not mention witnessing the defendant do anything to K or hearing an exchange between K and the defendant.

There were other inconsistencies between W's testimony at trial and the statements she gave the police.  At trial, she testified that the defendant threatened to shoot her mother, her father, and himself if she told anyone about his conduct.  He also told her that even if he did not kill her family, her mother would go to jail and she would be placed in a foster home.  However, in her pretrial statements W did not mention that the defendant had threatened to kill her parents; she mentioned only that he told her that she and her mother would go to jail.

Furthermore, W did not mention in any of the three pretrial statements that the defendant had reached into the shower and fondled her and K.  Moreover, W had told Detective Snow that the defendant had committed cunnilingus "[o]nce or twice," while she testified at trial that this conduct occurred approximately twenty times.

During the in camera review of W's statements, the trial judge was not in a position to know that W's statements would be inconsistent with her testimony.  Nonetheless, it was apparent

that W's credibility would be crucial to the Commonwealth's case and that the defendant's ability to effectively impeach W in the event her testimony was inconsistent with the statements would be hampered without access to the verbatim statements.  Moreover, during the in camera review the exculpatory nature of the pretrial statements with respect to the fellatio charge was apparent.  And although the Commonwealth's attorney may have acted in good faith by submitting the statements for an in camera review, the Commonwealth must accept the risk that the statements would prove to be exculpatory and, therefore, material to which the accused would be entitled.  See Cherricks, 11 Va. App. at 102, 396 S.E.2d at 401.

W's statement that the defendant never placed his penis in her mouth was highly relevant to determining W's credibility and, therefore, was essential to the defendant's ability to impeach W. See Robinson, 231 Va. at 150, 341 S.E.2d at 164 (holding that "[t]he impeachment value alone makes the [evidence] exculpatory").  Similarly, W's statements that were inconsistent with her trial testimony were relevant to impeach her credibility.  "When the `reliability of a given witness may well be determinative of guilt or innocence,' evidence affecting the credibility of that witness should not be concealed by the prosecution."  Burrows v. Commonwealth, 17 Va. App. 469, 472, 438 S.E.2d 300, 303 (1993) (quoting Napue v. Illinois, 360 U.S. 264, 269 (1959)).  Accordingly, the trial court erred by holding that

W's statements were not exculpatory and overruling the defendant's motion to obtain a verbatim copy of the statements.

Even though the statements were exculpatory, the defendant is not entitled to a new trial unless the statements were material. Humes v. Commonwealth, 12 Va. App. 1140, 1143, 408 S.E.2d 553, 555 (1991). "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A `reasonable probability' is a probability sufficient to undermine confidence in the outcome." Bagley, 473 U.S. at 682.[1]

Because the victims' testimony was the only evidence supporting the charges, W's credibility was a crucial factor for the jury in reaching its verdict. Accordingly, any evidence

---

[1] The standard of materiality for review of discovery violations is the same for a direct appeal as it is for a collateral attack. White v. Commonwealth, 12 Va. App. 99, 102, 402 S.E.2d 692, 695, aff'd, 13 Va. App. 284, 410 S.E.2d 412 (1991) (en banc). That standard is the same whether or not the trial court has conducted an in camera review of the material. See Brooks v. United States, 516 A.2d 913, 917 (D.C. 1986) (applying Bagley standard in a direct appeal when the trial court had conducted an in camera inspection of the requested material); Williams v. State, 544 So. 2d 782, 791-92 (Miss. 1987) (same); State v. Allen, 590 N.E.2d 1272, 1275, 1277-78 (Ohio Ct. App. 1990) (same); State v. Benn, 845 P.2d 289, 298, 300-01 (Wash. 1993) (same). But see State v. Laurie, 653 A.2d 549, 552 (N.H. 1995) (holding that under the State Constitution, once the defendant shows that the prosecution "knowingly withheld" exculpatory evidence, the burden shifts to the prosecution "to prove beyond a reasonable doubt that the undisclosed evidence would not have affected the verdict"); State v. Marshall, 586 A.2d 85, 192 (N.J. 1991) (rejecting Bagley standard in favor of "harmless constitutional error" standard when the defendant specifically requests information).

tending to cast doubt on her credibility was highly relevant to the defendant's claim that W was fabricating the charges and that he did not commit the offenses. The Commonwealth's refusal to disclose W's statements prevented the defendant from being able to effectively cross-examine W. "A factor in determining the materiality of undisclosed information is `[a]ny adverse effect that the prosecutor's failure to respond might have had on the preparation and presentation of the defendant's case.'" White, 12 Va. App. at 103, 402 S.E.2d 692, 695 (citing Bagley, 473 U.S. at 683), aff'd, 13 Va. App. 284, 410 S.E.2d 412 (1991) (en banc).

The Commonwealth contends that any error in not requiring the Commonwealth to disclose W's statements was harmless because whatever inconsistencies W's statements may have contained had a minimal effect on the trial outcome when all of the evidence is considered. According to the Commonwealth, W gave detailed accounts of numerous instances of sexual abuse, and for the most part, her pretrial statements were consistent with her testimony. In addition, K's testimony corroborated W's allegations about what took place on June 30, 1993.

The Commonwealth is correct that K's testimony largely corroborated W's version of the June 30, 1993 events. As to the other allegations, however, the Commonwealth's case depended solely on W's testimony. Accordingly, the jury's findings depended entirely upon W's credibility, and her pretrial statements would have been critical to evaluating her

-14-

credibility.

W's pretrial statements were particularly significant with respect to the sodomy charges involving fellatio and cunnilingus. The Commonwealth contends that when W's pretrial statement that the defendant never had his penis in her mouth is viewed in context, it is clear that she was "saying that she never voluntarily placed the defendant's penis in her mouth," but that he forced her to do so. Although the Commonwealth offers a reasonable interpretation for W's inconsistent statements, whether to accept the explanation and believe W's statements "was wholly within the province of the jury." Keener v. Commonwealth, 8 Va. App. 208, 214, 380 S.E.2d 21, 25 (1989). Credibility was the singular decisive issue in the case. The Commonwealth's failure to disclose W's statements precluded the defendant from presenting the prior inconsistent statement to the jury, and "prevented [him] from effectively using the [statements] for purposes of challenging [W's] credibility." Bowman, 248 Va. at 134, 445 S.E.2d at 112; see Burrows, 17 Va. App. at 472, 438 S.E.2d at 303 (reversing the defendant's convictions because the Commonwealth failed to disclose the criminal record of a witness when the record indicated "a real possibility of bias or a lack of credibility for that witness").

In addition, the Commonwealth's failure to disclose W's statements prevented the defendant from effectively impeaching W as to her claim that the defendant committed cunnilingus.

Although W told Detective Snow that the defendant had committed cunnilingus one or two times, she testified at trial that this conduct occurred "[m]aybe about twenty times." This was a significant variance that the defendant was unable to probe upon cross-examining W. In fact, the only question regarding the cunnilingus charge that defense counsel asked W was why she did not tell Detective Goss during her initial statement that the defendant had put his mouth on her vagina. Cf. Bowman, 248 Va. at 134, 445 S.E.2d at 112 (holding that late disclosure of exculpatory information did not prevent the defendant from challenging the witness's credibility).

Because W's testimony was the only evidence supporting the charges of fellatio and cunnilingus and because there were significant differences between her statements and her testimony, there is a reasonable probability that the jury would have found that the defendant did not commit these offenses if W's statements had been disclosed to the defendant. Moreover, if the jury, after considering W's statements, had found that the defendant did not commit fellatio or cunnilingus on W, it might also have concluded that W and K fabricated the other allegations. Thus, the inconsistencies with respect to the two charges of forcible sodomy were material to the defendant's guilt on all charges.[2] And even though the jury could have found the

---

[2] The inconsistencies in W's statements and testimony with respect to what she saw and heard in the defendant's living room on June 30, 1993, as well as her failure to mention in the statements that the defendant had threatened her parents are not

-16-

defendant guilty of the other charges, finding that the defendant did not commit fellatio and cunnilingus may well have mitigated his punishment.  See White, 12 Va. App. at 105, 402 S.E.2d at 696; Keener, 8 Va. App. at 216, 380 S.E.2d at 26.

Although the charges here involve shocking and disturbing conduct, they are charges that are easily made and difficult to defend.  In a case where credibility is the most important issue, withholding evidence that has significant impeachment value deprived the defendant of his due process right to a fair trial.  Accordingly, we hold that the statements were material to the defendant's guilt and punishment and we reverse the defendant's convictions.

## IV. The DNA Evidence

Although the Commonwealth's failure to disclose W's pretrial statements requires reversal of the convictions, those issues which may arise on remand must be addressed.  First, the defendant contends that the trial court erred by excluding DNA evidence which would have proven that the defendant was not the source of a seminal stain found on a bedspread taken from his house.

At trial, W testified that some of the sex acts had taken

---

sufficient alone to undermine confidence in the result of the trial.  Nonetheless, these inconsistencies did possess impeachment value, and when combined with the inconsistencies in W's allegations of fellatio and cunnilingus, support the conclusion that there was a reasonable probability that the jury would have reached a different result if the defendant had been able to impeach W with her statements.

place on a particular bedspread, and that the defendant had ejaculated on the bedspread. This bedspread was turned over to the police. Out of the presence of the jury, the defendant proffered testimony by Elizabeth Bush, a forensic scientist, and Robert Scanlon, a DNA specialist. Bush testified that she had identified a seminal stain on the bedspread and delivered the stain to Scanlon for analysis. Scanlon testified that his tests excluded the defendant as a possible donor of the stain. The trial court held that this DNA evidence was irrelevant.

Evidence is relevant and admissible that tends "to cast any light upon the subject of the inquiry . . . [or] add force and effect to a party's defense" so long as it does not violate any rules of admissibility. Cash v. Commonwealth, 5 Va. App. 506, 510, 364 S.E.2d 769, 771 (1988) (citations omitted). The defendant did not seek to introduce the evidence merely to show that other persons had ejaculated on the bedspread, but rather to exclude him as the person who had deposited the semen. The DNA evidence was, at least, minimally relevant because it tended to exclude the defendant as having deposited semen on the bedspread where W said he had ejaculated. Failure to admit relevant evidence is presumed prejudicial "unless it clearly appears from the whole record that such evidence, if it had been admitted, could not have changed the result." Id. at 511, 364 S.E.2d at 772 (quoting Speller v. Commonwealth, 2 Va. App. 437, 443, 345 S.E.2d 542, 546-47 (1986)). On retrial the evidence should be

admitted.

## V. The Defendant's Statement

As rebuttal evidence, the Commonwealth introduced a portion of the defendant's statement to Detective D.L. Goss in which the defendant characterized W as a "sweet person."  In addition, Detective Goss testified that the defendant did not mention the incident between W and T in his statement.  The defendant contends that the trial court erred by refusing to admit his entire statement into evidence.  According to the defendant, the entire statement was relevant because it established the context in which the defendant characterized W as a "sweet person," and established the context for the defendant's failure to mention the incident between W and T.

A statement proffered by the party who made it is generally inadmissible hearsay unless it falls within an exception.  King v. Commonwealth, 18 Va. App. 57, 59, 441 S.E.2d 704, 705 (1994).  "A defendant may introduce his or her own prior consistent statements when the prosecution suggests that the defendant has a motive to falsify, alleges that the defendant's testimony is a recent fabrication, or attempts to impeach the defendant with a prior inconsistent statement."  Id.

Although the defendant's characterization of the victim as a "sweet person" has little or no relevance, to the extent that the statement tends to impeach the defendant's characterization of W's testimony as false, the context in which the statement was

made is equally relevant to explain what was meant by W being a "sweet person."  Accordingly, if the defendant's prior statement that W is a "sweet person" is admitted on remand, the context in which it was made is admissible.

## VI. The Drawing

The trial court allowed the Commonwealth to introduce a drawing by W of the vibrator the defendant allegedly used. According to the defendant, the trial court erred by admitting the drawing because it was nonverbal hearsay offered to prove the truth of W's description of the vibrator.  W testified and the sketch or drawing that she previously made is not hearsay. Harrison v. Commonwealth, 9 Va. App. 187, 189-90, 384 S.E.2d 813, 815 (1989).  In Harrison, the Court held that a police artist's composite sketch was not hearsay because it was like a photograph.  Id.  We find no distinction between the sketches. Accordingly, the trial court did not err by admitting it.

We reverse the defendant's convictions and remand the case for further proceedings if the Commonwealth be so advised.

Reversed and remanded.